# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-05-00423-CV

---

**Kirby Highland Lakes Surgery Center, L.L.P., Appellant**

**v.**

**Edward E. Kirby, M.D. and Helen Kirby, Appellees**

---

### FROM THE DISTRICT COURT OF BURNET COUNTY, 33RD JUDICIAL DISTRICT
### NO. 31079, HONORABLE GUILFORD L. JONES, III, JUDGE PRESIDING

---

**&**

---

## NO. 03-05-00502-CV

---

**In re Kirby Highland Lakes Surgery Center, L.L.P.**

---

### ORIGINAL PROCEEDING FROM BURNET COUNTY

---

## O P I N I O N

Kirby Highland Lakes Surgery Center (the Partnership) filed a petition for writ of mandamus, 03-05-00502-CV, relying on the Federal Arbitration Act (FAA)[1] to contend that the district court abused its discretion in denying the Partnership's motion to compel arbitration of a

---

[1] *See* 9 U.S.C.A. §§ 1-16 (West 1999 & Supp. 2005).

dispute with one of the partners, Dr. Edward Kirby, and his wife, Helen Kirby. Contemporaneously, the Partnership also filed an interlocutory appeal, 03-05-00423-CV, purporting to challenge the district court's order under the Texas Arbitration Act (TAA). Concluding that the FAA rather than the TAA governs and that the Partnership is entitled to relief, we conditionally grant the petition for writ of mandamus and dismiss the interlocutory appeal as moot. *See In re Valero Energy Corp.*, 968 S.W.2d 916, 916-17 (Tex. 1998) (orig. proceeding).

## BACKGROUND

Dr. Edward Kirby and his wife, Helen Kirby, operated an outpatient surgical center in the Highland Lakes area.[2] In 2001, they were approached by several other doctors who were interested in forming a partnership and purchasing the center. After protracted negotiations, the parties ultimately agreed to a transaction in which (1) the Partnership would be formed between the other doctors, Edward Kirby, and Highland Lakes Physician Management, L.L.P., with the latter serving as managing partner with day-to-day responsibilities over operations and billing; and (2) the Partnership would simultaneously purchase the assets of the surgical center. The transaction was effectuated through two agreements, a Partnership Agreement and a Purchase and Sale Agreement, that were simultaneously executed on December 31, 2002.

The parties to the Partnership Agreement were Edward Kirby and the other doctors. Helen Kirby was not listed as a partner and did not sign the principal agreement. However, she did

---

[2] Helen Kirby served as office manager.

2

sign a "Joinder of Spouses" addendum, in which she stated that she was aware of the provisions of the Partnership Agreement and its effect on her community property interests and that she was "fully aware of, [understood], and fully consented[ed] to and agreed to" its provisions. The Partnership Agreement contained an arbitration clause, providing that all "disputes or controversies arising under or related to this Agreement shall be arbitrated."

Under the Purchase and Sale Agreement, the Kirbys sold to the Partnership the surgical center's real estate and all their equipment at the surgical center with the exception of certain personalty including the "YAG equipment and all fees generated in association with such YAG equipment."[3] The Kirbys' "right to retain all fees generated from the YAG equipment located on the Property . . . so long as such YAG equipment remains on the Property" was recited as part of the consideration for the Purchase and Sale Agreement. Unlike the Partnership Agreement, the Purchase and Sale Agreement did not contain an arbitration clause. However, the Purchase and Sale Agreement explicitly required "Seller" to execute the Partnership Agreement, which was attached and incorporated by reference.

For a time, the Partnership remitted fees to the Kirbys for use of the YAG equipment. In August 2003, however, the Partnership notified the Kirbys that it would no longer remit fees from the use of the YAG equipment, citing prohibitions in federal anti-kickback statutes. The Kirbys

---

[3] The "YAG equipment" is a type of laser used to perform certain medical procedures on the eye. It is apparently installed in the center's facilities. The Kirbys allege that the Partnership agreed to bill a facility fee each time the YAG is used and that this revenue would flow directly to the Kirbys rather than be divided among the partners.

eventually filed suit in district court on November 18, 2004. As later amended, the Kirbys' pleadings assert a claim for breach of contract solely under the "Purchase Agreement and related agreements, regarding the billing of the YAG laser," not the Partnership Agreement.[4] The Partnership moved to compel arbitration of the Kirbys' claims. On June 29, the district court denied the motion, ordering that the dispute was not governed by the arbitration clause and that Helen Kirby was not a party to a binding arbitration clause. The Partnership then filed this petition and the related interlocutory appeal from the district court's order.

**DISCUSSION**

In both its petition for writ of mandamus and its interlocutory appeal, the Partnership argues that the Kirbys' breach-of-contract claims are subject to the arbitration clause of the Partnership Agreement because either (1) the Partnership Agreement, including its arbitration clause, was incorporated by reference into the Purchase and Sale Agreement, or (2) this dispute "arises under or is related to" the Partnership Agreement. Separately, the Partnership also argues that Helen Kirby

---

[4] The Kirbys originally also asserted a breach-of-fiduciary-duty claim predicated upon allegations that "the formation of the Partnership and the purchase of the Center were two related and dependent transactions" that "could not successfully occur without the other" and that the partners' fiduciary duties under the Partnership Agreement extended to the Purchase and Sale Agreement. The Kirbys amended their petition to drop their breach-of-fiduciary-duty claim.

We will consider the Kirby's current pleadings when addressing whether their claims are subject to arbitration. *See Prudential Sec. Inc. v. Marshall*, 909 S.W.2d 896, 900 (Tex. 1995) (to determine whether claim falls within arbitration clause's scope, we look at terms of agreement and factual allegations in petition); *Drake Ins. Co. v. King*, 606 S.W.2d 812, 817 (Tex. 1980) (if pleading is amended, it ceases to be judicial pleading; statements in such pleading cease to be judicial admissions); *cf. Personal Sec. & Safety Sys., Inc. v. Motorola, Inc.*, 297 F.3d 388, 391 n.1 (5th Cir. 2002).

4

was bound to the arbitration clause through the "joinder of spouses" provision of the Partnership Agreement.

**Availability of mandamus versus interlocutory appeal**

Mandamus is an extraordinary remedy, available only when a trial court clearly abuses its discretion and when there is no adequate remedy on appeal. *See In re Kuntz*, 124 S.W.3d 179, 180 (Tex. 2003). When a request to arbitrate under the FAA is denied, the appellate remedy is through mandamus. *Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 272 (Tex. 1992); *American Med. Techs., Inc. v. Miller*, 149 S.W.3d 265, 269 (Tex. App.—Houston [14th Dist.] 2004, orig. proceeding). In contrast, interlocutory appeal is the proper remedy if this case is governed by the TAA rather than the FAA. *See Jack B. Anglin Co., Inc.*, 842 S.W.2d at 272 & n.10, 273. The Texas Supreme Court has instructed appellate courts that when, as here, parallel mandamus proceedings and interlocutory appeals are brought under the FAA and TAA, respectively, we should consolidate the two proceedings and consider them together. *See In re Valero Energy Corp.*, 968 S.W.2d at 916-17. We accordingly consolidate the two proceedings.

In its first issue in cause 03-05-00502-CV, the Partnership argues that the FAA, and not the TAA, governs this case. *See id.*; *see also* Tex. Civ. Prac. & Rem. Code Ann. §§ 171.001-.098 (West 1997 & Supp. 2005). The Partnership explains that it filed its interlocutory appeal invoking the TAA "[o]ut of an abundance of caution" in the event we find that the TAA applies. In their reply to the petition for writ of mandamus, the Kirbys concede that the FAA applies because the underlying dispute concerns billings to Medicare and Medicaid. We conclude that this dispute is governed by the FAA. We sustain the Partnership's first issue presented in cause 03-05-00502-

5

CV; we dismiss the interlocutory appeal, 03-05-00423-CV, as moot;[5] and we will proceed to address the merits of the FAA claim in the petition for writ of mandamus.

**Compelling arbitration under the FAA; general principles**

A party seeking to compel arbitration under the FAA must establish that: (1) there is a valid arbitration clause, and (2) the claims raised fall within that agreement's scope. *In re FirstMerit Bank*, 52 S.W.3d at 753 (Tex. 2001); *In re Oakwood Mobile Homes, Inc.*, 987 S.W.2d 571, 573 (Tex. 1999). The first element includes "gateway matters" such as whether a valid

---

[5] Texas law currently is unclear regarding the proper disposition of an interlocutory appeal under the TAA from the denial of arbitration where the FAA is held to govern the arbitration provision at issue. Some courts of appeals have determined that, if the FAA applies, any right to relief under the TAA is preempted, and they are without jurisdiction to consider the interlocutory appeal. *See Kroupa v. Casey*, No. 01-05-00224-CV, 2005 Tex. App. LEXIS 10212, at *14-15 (Tex. App.—Houston [1st Dist.] Dec. 8, 2005, no pet. h.); *Mony Secs. Corp. v. Padilla*, 132 S.W.3d 201, 203 & n.4 (Tex. App.—Corpus Christi 2004, pet. dism'd by agr.); *Verlander Family Ltd. P'ship v. Verlander*, No. 08-02-00135-CV, 2003 Tex. App. LEXIS 1413, at *9 (Tex. App.—El Paso Feb. 13, 2003, no pet.); *Pennzoil Co. v. Arnold Oil Co.*, 30 S.W.3d 494, 498 (Tex. App.—San Antonio 2000, orig. proceeding); *see also* Roger W. Hughes, *Interlocutory Appeals from Orders Denying Arbitration Under the Texas Arbitration Act: Federal Law Does Not Preempt Jurisdiction*, 14 The Appellate Advocate 18-22 (Fall 2005) (disputing this view and urging that it enables appellate courts to evade supreme court review by finding that FAA governs, summarily denying mandamus, and dismissing TAA appeal for want of jurisdiction, all without supplying opinion detailing reasoning). The supreme court recently granted review to consider this question. *In re D. Wilson Construction Co.*, No. 05-0326 (Tex. filed Apr. 25, 2005), *consolidated with American Standard v. Brownsville Indep. Sch. Dist.*, No. 05-0327 (Tex. filed April 22, 2005); *see American Standard v. Brownsville Indep. Sch. Dist.* (*In re D. Wilson Constr. Co.*), Nos. 13-04-184-CV & 13-04-333-CV, 2005 Tex. App. LEXIS 1016, at *6 (Tex. App.—Corpus Christi Feb. 10, 2005, pet. granted). We need not consider this issue here, however. In cases where it has granted full relief under the FAA, the supreme court has dismissed as moot parallel TAA appeals. *See In re L & L Kempwood Assoc., L.P.*, 9 S.W.3d 125, 128 (Tex. 1999); *In re Valero Energy Corp.*, 968 S.W.2d 916, 917 (Tex. 1998). *But see Kroupa*, 2005 Tex. App. LEXIS 10212, at *14-15 (granting relief under FAA and dismissing TAA appeal for want of jurisdiction on basis that TAA was preempted). Thus, because we ultimately conclude that the Partnership is entitled to full relief under the FAA, we dismiss as moot its TAA appeal.

arbitration clause exists and whether an arbitration clause is binding on a nonparty. *In re Weekley Homes, L.P.*, 49 Tex. Sup. Ct. J. 55, 2005 Tex. LEXIS 817, at *4-5 (Tex. Oct. 28, 2005). Such matters are governed by Texas law. *Id*. The scope of a valid arbitration clause, however, is governed by federal law. "Arbitration is heavily favored under federal and state law and should not be denied unless it can be said with positive assurance that the arbitration clause cannot be interpreted so as to encompass the dispute in question." *In re Sun Communications, Inc.*, 86 S.W.3d 313, 317 (Tex. App.—Austin 2002, no pet.) (citing *Prudential Sec. Inc. v. Marshall*, 909 S.W.2d 896, 898-99 (Tex. 1995)). "We resolve doubts concerning the scope of coverage of an arbitration clause in favor of arbitration." *Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998).

**Whether the Kirbys' claims fall within the arbitration clause**

There is no dispute that Edward Kirby, as one of the Partnership's partners, is a party to the arbitration clause contained in the Partnership Agreement, nor do the Kirbys challenge the validity of that provision.[6] The parties do dispute whether Helen Kirby, as a nonparty to the

---

[6] The Kirbys argue that the Partnership "cannot have it both ways" by both asserting an illegality defense to its obligations regarding YAG facility fees while attempting to invoke arbitration under the same set of agreements. *See American Med. Tech., Inc. v. Miller*, 149 S.W.3d 265, 272-73 (Tex. App.—Houston [14th Dist.] 2004, orig. proceeding). *Miller* involved a defendant who denied the very existence of the employment agreement made the basis of its arbitration claim. *Id*. at 270-72. The *Miller* court contrasted "the more common argument made by a party that does not challenge the existence of a contract, but rather attacks the enforceability of the contract." *Id*. at 272-73. Enforceability is normally an issue for the arbitrator unless the claim is specifically directed at the arbitration provision alone. *Id*. at 272-73. The Partnership's illegality defense is in the nature of "this more common argument"—it does not dispute the existence of the Partnership Agreement and related agreements, but merely attacks enforceability.

7

Partnership Agreement, can be bound by its arbitration provision. They also contest whether the Kirbys' claims fall within the provision's scope. Because the arbitration agreement's scope is potentially decisive of the Partnership's right to arbitrate against either Edward or Helen Kirby, we first turn to that issue.

To determine the scope of an arbitration agreement, we first look to the terms of that agreement. *See Marshall*, 909 S.W.2d at 900. We then examine the factual allegations in the petition rather than the legal causes of action. *Id*.

### *Pleadings*

The Kirbys pleaded that, after operating their surgical center for approximately three years, they were approached by principals of the general partner of the Partnership regarding the possible sale of the center to the Partnership. "These principals assured Dr. and Mrs. Kirby that their legal and other advisors were experts in the areas of acquisition of outpatient surgery centers, medicare and medicaid billing, operations of outpatient surgery centers, and the formation of entities composed of practicing physicians and an operating partner to own and operate the outpatient surgery centers." Lengthy negotiations ensued, but "nearly foundered over the issue of price." Thus, the Kirbys alleged,

13. In order to adequately compensate the Kirbys, the Partnership agreed in the Purchase Agreement conveying the Center that Dr. Kirby would continue to own and retain all of the economic value and income stream from . . . the YAG Laser. . . . Dr. Kirby, Mrs. Kirby, and the General Partner were all aware of and discussed the value of the YAG Laser in negotiating the Purchase Agreement pursuant to which Dr. and Mrs. Kirby conveyed the Center to the Partnership.

8

14. The Kirbys and the Partnership agreed that while Dr. Kirby would continue to own the YAG laser (because it was excluded from the sale), the Partnership would bill a facility fee for the deployment of the YAG laser in connection with posterior capsulotomy and other procedures performed by Dr. Kirby at the Center. That revenue stream, even though it would be billed and collected by the Partnership, would flow directly and solely to Dr. Kirby less a nominal administration fee. By carving out this expected revenue stream from the billing of facility fees for the YAG laser, the Kirbys would receive fair consideration and compensation for the sale of the Center to the Partnership.

15. This understanding between the Kirbys and the Partnership was memorialized in the Purchase Agreement by the exclusion of the YAG laser from the sale of the other assets that composed the Center. It was recognized and expected by all parties that Dr. Kirby would continue to use the YAG laser at the Center after the sale on the terms outlined above. With all of these understandings memorialized, Dr. and Mrs. Kirby agreed to sell the Center to the Partnership on March 3, 2003.

After remitting the YAG facility fee proceeds to the Kirbys "as had been agreed" for approximately four months, "the Partnership announced that it would no longer honor the Purchase Agreement and agreed practice regarding Dr. Kirby's sole receipt of the YAG laser facility fees." Although the Partnership gave assurances that "it would determine a way to make sure the Kirbys received what they contracted for, namely, the full value and benefit of the YAG laser facility fee reimbursements," "the Partnership failed and refused to honor its agreements." The Kirbys pleaded this "Purchase Agreement and related agreements, regarding the billing of the YAG laser" as the basis for their breach-of-contract claim.

The Kirbys also made the following allegation regarding the relationship between the Purchase and Sale Agreement and the Partnership Agreement:

The purchase of the Center was related to, but independent from, the formation of the Partnership. The Partnership, which was formed pursuant to a written partnership

9

agreement, did not involve or include Mrs. Kirby. The Partnership involves numerous additional third parties who have no direct stake or interest in this suit. The partnership agreement set forth numerous undertakings by the various partners none of which are material to the dispute raised herein.

### Text of arbitration clause

The arbitration clause of the Partnership Agreement, provides, in relevant part, that "[a]ll disputes or controversies arising under or related to this Agreement shall be arbitrated." The Partnership asserts two arguments for construing this clause to encompass the Kirbys' allegations regarding the YAG laser facility fees. First, the Partnership emphasizes that the Purchase and Sale Agreement incorporates the Partnership Agreement by reference—the sale agreement attached, as one of several exhibits, a copy of the executed Partnership Agreement and "incorporated [all of the exhibits] as part of this Agreement," each to have "the same meaning as if they were incorporated fully within the text of this Agreement." Second, the Partnership contends that, even if the Partnership Agreement was not fully incorporated into the Purchase and Sale Agreement, the Kirbys' claims nonetheless fell within the scope of the Partnership Agreement's arbitration clause. Because we agree that the Partnership Agreement's arbitration clause embraces the Kirbys' claims, we need not consider the Partnership's incorporation-by-reference argument.

The Partnership Agreement's arbitration clause embraces "[a]ll disputes or controversies arising under *or related to* this Agreement," terminology that federal courts applying the FAA have termed "extremely broad" and "capable of expansive reach." *See Pennzoil Exploration*, 139 F.3d at 1067-68; *see, e.g., Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 625-26 (1985); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 397-98

10

(1967). Such "related to" language, in contrast to narrower phrases like "arising out of," extends to "all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute" or that "touch" matters covered by the contract containing the arbitration provision. *Pennzoil Exploration*, 139 F.3d at 1067-68. The breadth of the Partnership Agreement's arbitration clause distinguishes it from those in many of the cases cited by the Kirbys. *See Weber v. Hall*, 929 S.W.2d 138, 142-43 (Tex. App.—Houston [14th Dist.] 1996, orig. proceeding) (construing arbitration clause covering controversies or disputes "as to all or any part of this Agreement").[7] However, "related to" does not mean unlimited in scope. *Penzoil Exploration*,

---

[7] The Kirbys suggest that our sister courts have split concerning the appropriate standard for determining whether their dispute falls within the arbitration provision of the Partnership Agreement. Applying chiefly Texas law, some of these courts appear to espouse what the Kirbys characterize as a "close" view, requiring the claim to be "so interwoven with the contract that it cannot stand alone," as contrasted with claims "completely independent of the contract and [that] could be maintained without reference to the contract." *See Associated Glass, Ltd. v. Eye Ten Oaks Invs., Ltd.*, 147 S.W.3d 507, 513 (Tex. App.—San Antonio 2004, no pet.); *Loy v. Harter*, 128 S.W.3d 397, 403-05 (Tex. App.—Texarkana 2004, pet. denied); *Valero Energy Corp. v. Teco Pipeline Co.*, 2 S.W.3d 576, 590 (Tex. App.—Houston [14th Dist.] 1999, no pet.); *Valero Energy Corp. v. Wagner & Brown, II*, 777 S.W.2d 564, 566 (Tex. App.—El Paso 1989, writ denied). In contrast, the Waco court of appeals has applied a standard closer to the federal one we apply above. *See Dennis v. College Station Hosp., L.P.*, 2005 Tex. App. LEXIS 4258, at *7 (Tex. App.—Waco June 1, 2005, pet. filed) ("[g]enerally, if the facts alleged 'touch matters,' have a 'significant relationship' to, are 'inextricably enmeshed' with, or are 'factually intertwined' with the contract that is subject to the arbitration agreement, the claim will be arbitrable.").

As we are required to do, we will rely on federal law to determine the scope of the Partnership Agreement's arbitration provision, but we note that the Kirby's close-connection cases are founded ultimately upon *Wagner & Brown, II*, which involved narrow arbitration language governing any dispute "arising under this contract." 777 S.W.2d at 566; *see Associated Glass*, 147 S.W.3d at 513; *Loy*, 128 S.W.3d at 403-05 (quoting *Fridl v. Cook*, 908 S.W.2d 507, 511 (Tex. App.—El Paso 1995, writ dism'd w.o.j.), which relied on *Wagner & Brown, II*); *Teco Pipeline Co.*, 2 S.W.3d at 590 (quoting standard from *Wagner & Brown, II*). In contrast, the Waco court in *Dennis* relied in part on the language of the arbitration clause in that case, which, like the one here, applied to claims "relating to this Agreement." 2005 Tex. App. LEXIS 4258, at *3 ("the term used in many

11

139 F.3d at 1067 n.8 ("We realize that even broad clauses have their limits."). For instance, such language is not as broad as "any and all disputes between" the parties. *See Neal*, 918 F.2d at 36-37.[8]

The Kirbys pleaded that "[t]he purchase of the Center," the subject matter of the Purchase and Sale Agreement, "was *related to*, but independent from, the formation of the Partnership," the subject matter of the Partnership Agreement. The Kirbys also pleaded that the agreements conferring them rights to YAG laser facility fees were memorialized at least in part in the Purchase and Sale Agreement and "related agreements." In these ways, the Kirbys have judicially admitted that their factual allegations concerning the YAG laser fees are, to some degree, "related to" the Partnership Agreement.

The Kirbys' pleadings, while elsewhere stating that the purchase and partnership formation were "related . . . but independent," allege that the Kirbys entered into both the sale and the partnership to procure certain benefits of the arrangement:

> 10. On or about July 2001, the Kirbys were approached by principals of the general partner of the Partnership regarding *the possible sale of the [Kirbys' surgical] Center to the Partnership.* These principals held themselves out as *experienced managers of outpatient surgery centers.* These principals assured Dr. and Mrs.

arbitration agreements and in the agreement at issue here is the term 'related'—not 'interrelated,' 'interwoven,' or 'interdependent'").

[8] In *Neal*, one of the principal cases on which the Partnership relies, a restaurant chain and its franchisee agreed in six license agreements to arbitrate "any and all disputes between" the parties. *Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34, 35 (5th Cir. 1990). A dispute later arose under a purchase agreement concerning the restaurant facilities that had been executed at the same time as the license agreements. *Id*. at 36-37. The purchase agreement did not contain its own arbitration provision. *Id*. at 37. "Recognizing that the License Agreements were at the heart of their deal," the Fifth Circuit held that "when the parties included a broad arbitration clause in the essential License Agreements covering 'any and all disputes,' they intended the clause to reach all aspects of the parties' relationship including the purchase of the physical properties." *Id*. at 38.

Kirby that they uniquely understood and grasped the complexities *of the arrangement they proposed.* These principals assured Dr. and Mrs. Kirby that their legal and other advisors were experts in the areas of *acquisition of outpatient surgery centers, medicare and medicaid billing, operations of outpatient surgery centers, and the formation of entities composed of practicing physicians and an operating partner to own and operate the outpatient surgery centers. Pursuant to these representations, which continued throughout the negotiations process*, lengthy negotiations ensued between the Kirbys, on one hand, and the Partnership, on the other hand.

(Emphases added.). The Kirby's intent to procure these benefits was ultimately reflected in both the Purchase and Sale Agreement and the Partnership Agreement. The latter appointed Highland Lakes Physician Management, L.L.P., as managing partner and charged that entity with day-to-day operations and management of the surgery center, including collecting bills and paying debts. According to the Kirbys' pleadings, the dispute in this case arises from the Partnership's failure to pay the amounts due to the Kirbys from the bills it collected for the use and operation of the YAG equipment. As the Kirbys' own pleadings emphasize, the agreement to exclude the YAG equipment and rights to facility fees was also an integral part of this overall transaction, a product of the Kirbys' bargaining over price.

In *Personal Security & Safety Systems Inc. v. Motorola, Inc.*, the Fifth Circuit considered a similar situation of simultaneously executed contracts, where only one of the contracts of which contained an arbitration clause with broad "related to" language. 297 F.3d 388, 392-95 (5th Cir. 2002); *see also Ramco*, 139 F.3d 1067. In *Personal Security & Safety*, Motorola initiated negotiations with Personal Security and Safety Systems Inc. (PSSI) concerning an investment in PSSI that would give Motorola access to certain technology that PSSI was developing. 297 F.3d 390-91. The parties eventually executed two agreements: (1) a Stock Purchase Agreement, under

13

which Motorola would provide a total of twelve million dollars in financing in return for a convertible debenture and equity stake in PSSI; and (2) a Product Development and License Agreement, under which the parties agreed to collaborate on the development of new technologies based on existing PSSI systems and which addressed respective rights to existing or future intellectual property.[9] *Id*. at 391. Only the Product Development Agreement contained an arbitration clause, which, like the one here, extended to disputes "arising out of or relating to this Agreement." *Id*. at 392-93. PSSI subsequently sued Motorola for failing to provide it financing to which PSSI claimed it was entitled under the Stock Purchase Agreement, claiming breach of that agreement and fraudulent inducement. *Id*. at 391. Motorola sought unsuccessfully in the trial court to compel arbitration. *Id*.

The Fifth Circuit relied on the broad language of the Product Development Agreement's arbitration clause, as well as the principle that "separate agreements executed contemporaneously by the same parties, for the same purposes, and as part of the same transaction, are to be construed together." *Id*. at 393. "Although the Stock Purchase Agreement and the Product Development Agreement govern[ed] different facets of the parties' relationship," both agreements were "key elements of a transaction in which Motorola agreed to provide financing in return for a stake in PSSI and access to PSSI's technology." *Id*. The court also observed that each agreement expressly anticipated the execution of the other and that the Product Development Agreement was attached as an exhibit to the Stock Purchase Agreement. *Id*. It added that "the Product Development

---

[9] The parties also executed a Shareholders Agreement that was not at issue in the case. *See Personal Sec. & Safety*, 297 F.3d at 390.

14

Agreement, which governed access to each party's intellectual property as well as the parties' joint development efforts, was a central part of this transaction," pointing out that PSSI pleaded that Motorola had originally engaged in negotiations primarily to gain access to PSSI's technology. *Id*. at 394 & n.7. The court concluded that "where the parties include a broad arbitration provision in an agreement that is 'essential' to the overall transaction, we will presume that they intended the clause to reach all aspects of the transaction—including those aspects governed by other contemporaneously executed agreements that are part of the same transaction." *Id*. at 395. Finding no "contrary expression of intent" in the Stock Purchase Agreement, the court held that the Product Development Agreement's arbitration clause covered all disputes related to the subject matter of the entire transaction between PSSI and Motorola. *Id*. "It is of no moment," the court maintained, that each agreement "focuses on a different aspect of the transaction and could be a valid free-standing contract." *Id*.

The circumstances in *Personal Security & Safety* are similar to those here: the Partnership Agreement contains a broad arbitration clause extending to disputes "related to" that agreement; that agreement and the Purchase and Sale Agreement were executed at the same time as parts of a single transaction; and the Partnership Agreement was essential to the overall transaction. In light of these circumstances, applicable case law, and the Kirbys' own admissions in their pleadings, we do not have "positive assurance that the arbitration clause is not susceptible of an interpretation which would cover the dispute at issue." *Id*. at 395 (internal citations and quotations omitted).

15

In response, the Kirbys maintain that the Purchase and Sale Agreement provides that "venue of any legal action filed in connection herewith shall be in Burnet County." However, the Fifth Circuit rejected a similar contention in *Personal Security & Safety* and found such a clause to show that the parties intended the clause to apply only in the event of a non-arbitrable dispute that must be litigated in court. *See id*. at 395-96. Thus, the venue clause governs only after the court determines that the dispute is not subject to arbitration; the venue clause does not itself except disputes from arbitration. *See id*. The arbitration clause in this case functions similarly, and we reject the Kirbys' argument.

Additionally, the Kirbys attempt to draw a temporal distinction between the Partnership Agreement, governing the "ongoing internal affairs" of the Partnership, and the Purchase and Sale Agreement, governing "a finite transaction." *See Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*, 374 F.3d 1 (1st Cir. 2004). To the contrary, as the Kirbys emphasize in their own pleadings, the Partnership's obligations related to the YAG equipment and fees are ongoing in nature. *Cf. Personal Sec. & Safety*, 297 F.3d at at 390-92. In addition, the *Fit Tech* court specifically relied on the fact that both agreements it was considering contained their own alternative dispute resolution provisions. *Fit Tech*, 374 F.3d at 10-11.[10] To have read a general arbitration clause found in one contract into another, which specified a different, and more narrow, dispute resolution

---

[10]    The Kirbys also rely upon *Van Weber v. Hall*, 929 S.W.2d 138, 141-43 (Tex. App.—Houston [14th Dist.] 1996, orig. proceeding), which involved employment agreements containing arbitration clauses and annual sales agreements that did not. However, *Van Weber* involved a narrow arbitration clause covering only any "controversy or dispute . . . as to all or any part of this Agreement," not the broad "related to" language at issue here. *See id*. at 142.

16

process, would have rendered the language of the second agreement redundant. *See id*. at 10. Here, only the Partnership Agreement contains a dispute resolution provision.

Finally, the Kirbys emphasize that the parties to the Purchase and Sale Agreement differed from those to the Partnership Agreement. Specifically, while the Kirbys and the Partnership were the parties to the sale agreement, only Edward Kirby and the other individual partners—and not Helen Kirby—were parties to the Partnership Agreement. *See Personal Sec. & Safety*, 297 F.3d at 393 ("separate agreements executed contemporaneously by the same parties, for the same purposes, and as part of the same transaction, are to be construed together"). With regard to Edward Kirby, we find these distinctions immaterial. He was a party to both agreements, and the purpose of the two agreements was to be one complete transaction—the creation of the Partnership to buy the assets of the surgical center.

In sum, we hold that the Kirbys' allegations relating to the YAG equipment and facility fees are "related to" the Partnership Agreement, and subject to the arbitration clause contained in that agreement. Because Edward Kirby is a party to the Partnership Agreement, his claims are subject to arbitration.

**Whether Helen Kirby can be compelled to arbitrate her claims**

We now consider the Partnership's fourth issue, whether Helen Kirby, as a nonparty to the Partnership Agreement, can be compelled to arbitrate under the Partnership Agreement's arbitration clause. The district court concluded that "Helen Kirby is not a party to a binding arbitration." The Partnership challenges this conclusion on two grounds. First, relying on the undisputed fact that Helen Kirby is a party to the Purchase and Sale Agreement, the Partnership

17

contends that she is also a party to the Partnership Agreement's arbitration clause because the Purchase and Sale agreement incorporated the Partnership Agreement. Second, the Partnership argues that Helen Kirby bound herself to arbitrate disputes arising from or relating to the Partnership Agreement by executing a "Joinder of Spouses" addendum to the Partnership Agreement:

> The Partners' spouses join in the execution and delivery of this Agreement for the express purpose of binding their respective community property interests, if any, in the Partnership Units. The Partners' spouses are fully aware of, understand, and fully consent and agree to the provisions of this Agreement and its effect upon any community property interests they may now or hereafter own, and agree that the termination of their marital relationship with any Partner for any reason or for no reason will not have the effect of removing any Partnership Units of the Partnership otherwise subject to this Agreement from coverage and that their awareness, understanding, consent, and agreement are evidenced by their signing this exhibit this exhibit to the Agreement.

We need consider only the Partnership's second argument.

By purporting to "join in the execution and delivery of this Agreement" and "fully consent and agree to the provisions of this Agreement," the Partnership asserts that Helen Kirby agreed to be bound by the Partnership Agreement's arbitration clause. Because we have determined that the Kirbys' claims regarding the YAG laser facility fees are "related to" the Partnership Agreement, we agree that Helen Kirby, like her husband, must arbitrate her claim.

Helen Kirby is not a party to the Partnership Agreement. It is not entirely clear whether Texas or federal law governs whether a nonparty must arbitrate, and the inquiry can involve issues of both whether an arbitration agreement has been formed (a state law issue) and the scope of an arbitration clause governed by the FAA (federal law). *See In re Weekley Homes, L.P.*, 2005 Tex. LEXIS 817, at *8.; *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 738-39 (Tex. 2005).

We will begin by considering, under Texas state law, whether Helen Kirby's execution of the joinder of spouses addendum bind her to arbitration. When construing a written contract, our paramount concern is to ascertain the true intentions of the parties as expressed in the instrument and we should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Coker v. Coker*, 650 S.W.2d 391, 393-94 (Tex. 1983).

The joinder of spouses addendum is intended to address the rights of partner spouses holding potential community property interests in partnership units. To eliminate these potential limitations on the operation of the Partnership, the spouses "join in the execution and delivery of this Agreement for the express purpose of binding their respective community property interests, if any, in the Partnership Units," and "are fully aware of, understand, and fully consent and agree to the provisions of this Agreement and its effect upon any community property interests they may now or hereafter own." The Partnership Agreement to which Helen Kirby "fully consent[ed] and agree[d]" includes the arbitration clause. *Cf. In re Weekley Homes, L.P.*, 2005 Tex. LEXIS 817, at *10-11 (describing incorporation by reference as one means by which nonparties to arbitration agreements may be bound to arbitrate).

Having determined that Helen Kirby has consented to arbitration under the Partnership Agreement, we now address the scope of that agreement. Federal law governs this aspect of our inquiry. *Id*. at *6 (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Applying those principles, we have previously determined that the Kirbys' claims regarding the YAG equipment fees are "related to" the Partnership Agreement and thus fall

19

within its arbitration provision. We thus conclude that Helen Kirby is bound to arbitrate her claim and that the district court abused its discretion in determining otherwise.

## CONCLUSION

We consolidate causes 03-05-00502-CV, *In re Kirby Highland Lakes Surgery Center, L.L.P.*, and 03-05-00423-CV, *Kirby Highland Lakes Surgery Center L.L.P. v. Edward E. Kirby, M.D., & Helen Kirby*. The Kirbys have conceded that the FAA applies, and, in cause 03-05-00502-CV, we have concluded that the FAA requires both Edward and Helen Kirby to arbitrate their claim regarding YAG equipment fees. Therefore, the district court abused its discretion in not ordering their claims to arbitration.

We conditionally grant the petition for writ of mandamus and order the trial court to compel arbitration of the Kirbys' claims. The writ will issue only in the unlikely event that the district court does not modify its June 29 order consistent with this opinion. We dismiss cause 03-05-00423-CV as moot.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Waldrop

Dismissed as Moot in Cause No. 03-05-00423-CV

Filed: January 13, 2005

20