COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-216-CV

TINA ST. CLAIR APPELLANT

V.

BROOKE FRANCHISE CORPORATION APPELLEE

------------

FROM THE 348TH DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

The trial court granted Appellee Brooke Franchise Corporation’s motion to dismiss the suit filed against it by Appellant Tina St. Clair.  The motion alleged that Tina is bound by the forum selection clause in a contract between Brooke Franchise Corporation (“BFC”) and Tina’s husband.  Because we hold that Tina is not bound by the forum selection clause, we reverse the trial court’s order and remand this case for trial.

Facts and Procedural History

On October 15, 2003, Tina’s husband, Tim St. Clair, and his business partner entered into a written contract (“the Agreement”) to sell their insurance agency to BFC.  The Agreement consisted of eight pages containing the principal agreement between the parties (the “Principal Agreement”) and subsequent pages of addenda and exhibits.  The Principal Agreement contained a mediation clause, an arbitration clause, and a forum selection clause limiting jurisdiction and venue over any disputes arising out of the Agreement to either Phillips County District Court in Phillips County, Kansas, or the U.S. District Court having jurisdiction over that county.

The Principal Agreement also contained noncompete covenants in which Tim and his partner agreed not to directly or indirectly engage in the business of selling insurance policies within a fifty-mile radius of Richland Hills, Texas and Arlington, Texas, for five years after the sale date.  Tim and his partner also signed a separate addendum in which they agreed to be bound by the noncompete covenants in the Principal Agreement.  Tina did not sign this addendum or the Principal Agreement and was not listed as a party on either of them.

Tina did, however, sign a “Consent of Spouse,” which appeared after the Principal Agreement and before the addenda and exhibits.  The “Consent of Spouse” reads as follows: 

Consent of Spouse*

*Required of individual sellers in Arizona, California, Idaho, Lousisiana, Nevada, New Mexico, Texas, Washington and Wisconsin

I acknowledge that I have read the foregoing Agreement and that I know its contents.  I am aware that by its provisions my spouse agrees to sell all interest in the assets described therein, including my community interest in them.  I hereby consent to the sale, approve of the provisions of the Agreement, and agree that those assets and my interest in them are subject to the provisions of the Agreement and that I will take no action at any time to hinder operation of the Agreement on those assets or my interest in them.

In June 2005, less than two years after the sale of Tim’s insurance agency, Tina opened an insurance agency, leasing office space for the business in Bedford, Texas.  Tim began operating a mortgage lending business and occupying a portion of the leased space for that purpose.

In August 2005, the St. Clairs received a letter from BFC demanding that both Tina and Tim immediately cease and desist from selling and writing insurance policies out of Tina’s office.  The letter also demanded that the St. Clairs move Tina’s insurance business outside of the geographic noncompete area specified in the Agreement.

On August 8, 2005, Tina filed an action seeking, among other things, a declaration that she is not bound by the noncompete provision, that the “Consent of Spouse” merely acknowledges her potential community interest in the assets being sold through the Agreement and her consent to the sale, and that neither the “Consent of Spouse” nor the Agreement is enforceable against her because neither is supported by legal consideration.  Tina also claimed intentional interference with business relations and requested permanent injunctive relief prohibiting BFC from interfering with her business.

BFC filed its answer on November 4, 2005, along with a motion to dismiss, which argued that Tina was bound by the forum selection clause of the Principal Agreement.  The court held a hearing on the motion on February 3, 2006, and subsequently entered an order granting the motion and dismissing the case without prejudice to refiling the same causes of action in Phillips County, Kansas.  This appeal followed.

Standard of Review

We use a de novo standard of review “to the extent that our review involves contractual interpretation,” such as interpretation of a forum-selection clause.
(footnote: 2)  We review for abuse of discretion a trial court’s determination of a motion to dismiss, including a motion based on a forum selection clause.
(footnote: 3)  The scope of our review is limited to the arguments raised in the motion to dismiss.
(footnote: 4)  To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable.
(footnote: 5)  A trial court abuses its discretion if it misapplies the law to established facts,
(footnote: 6) and a trial court’s erroneous legal conclusion, even in an unsettled area of law, is an abuse of discretion.
(footnote: 7)
Analysis

Tina argues that she was not a party to the Agreement and that she is not otherwise bound by the forum selection clause.  BFC argues that Tina is clearly a signatory to the Agreement, and that whether she is a signatory or not she is bound by the Agreement because she accepted benefits in the form of community funds.

Accordingly, we turn first to whether Tina is a signatory to the Agreement.  The Principal Agreement unambiguously states that it is “by and between” Tim and Tim’s business partner as sellers and BFC as buyer.  Tina is not listed in the Principal Agreement as a seller or in any other capacity.  A signature block at the end of the Principal Agreement bears the signature of Tim and his business partner as “sellers” and BFC as “purchaser.”  Tina did not sign this page.  Addenda and exhibits to the Principal Agreement begin on the next page.  Tina’s name and signature appear only on the “Consent of Spouse,” placed after the signature page for the Principal Agreement and the noncompete addenda signed by Tim and his business partner, and before the exhibits and addenda.  Because Tina did not sign the Principal Agreement, she is not a signatory to it.
(footnote: 8)
 BFC appears to argue that Tina is a signatory to an agreement in which she expressly agreed to be bound by the Principal Agreement.  We must therefore determine whether the “Consent of Spouse” contains such an agreement.

The most basic policy of contract law is the protection of the justified expectations of the parties.
(footnote: 9)  In construing a contract, we determine the parties’ true intentions as expressed in the contract by examining the entire writing “in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.”
(footnote: 10)  We should construe the contract “from a utilitarian standpoint bearing in mind the particular business activity sought to be served” and “avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.”
(footnote: 11)  We look first to the contract’s plain language “unless the contract itself shows [the terms] to be used in a technical or different sense,”
(footnote: 12) and we presume that the contracting parties “intend every clause to have some effect.”
(footnote: 13)
 By the plain language of the “Consent of Spouse,” Tina agreed that the assets sold by her husband are bound by the Agreement, and she agreed to the terms of the Principal Agreement so far as they affect those assets.  In other words, Tina agreed that the company’s assets were being purchased under the Agreement, and as far as she had any interest in those assets, she was bound by the Principal Agreement and could not later claim an interest in them.  But nowhere did she agree that 
she herself 
was bound by the Principal Agreement, including the noncompete language.
(footnote: 14)
 BFC in its brief contends that it is undisputed that Tina

“Acknowledged she read the agreement”;

“Knew and understood its content”;

“Knew that her community interest in the agency assets were being sold under the agreement”;

“Consented to the sale of the agency assets under the terms of the agreement”;

“Agreed that her interest in the agency assets were subject to the agreement provisions”; and

“Agreed to take no action to hinder the operation of the agreement, including its noncompetition provisions.”

Even taking the above as true, BFC by its own interpretation of the “Consent of Spouse” does not argue that Tina agreed that 
she
 would be bound or subject to the Principal Agreement, only that her 
assets
 would be and that she would not hinder the Principal Agreement’s operation on those assets.  Tina’s arguments parallel this interpretation.  Her brief states, “[w]hile she may have approved [of] 
her husband
 selling his insurance agency; approved 
her husband
 entering into a non-compete agreement; approved 
her husband
 agreeing to certain ADR provisions; she did not in any way agree to make 
herself
 a party to those provisions (or, for that matter, any others contained in the Agreement).”  We agree with both parties that Tina agreed to make her interest in the business assets bound by the Principal Agreement.  But by the plain language of the “Consent of Spouse,” she did not agree to more than that. 

Further, the “Consent of Spouse” states that it is required to be signed in only nine named states, and at Tina’s request we take judicial notice of the fact that each listed state is a community property state.
(footnote: 15)  This language supports the construction that the “Consent of Spouse” was intended by the parties only to address community property law that might have interfered with the execution of the Agreement and to prevent Tina from later disputing the effectiveness of the Agreement as to any community property interest she may have had in her husband’s business assets.  Applying the plain meaning of the “Consent of Spouse” language, bearing in mind the particular business activity sought to be served by the “Consent of Spouse” and the Agreement as a whole, we avoid a construction that is unreasonable, inequitable, and oppressive
(footnote: 16) and hold that the “Consent of Spouse” does not bind Tina as a signatory to the Principal Agreement.  We sustain Tina’s first issue.

We next consider BFC’s argument that, even if Tina is not a signatory, she is bound by the Principal Agreement because she accepted benefits from it.  BFC relies on
 In re Weekley Homes, L.P.
 for the proposition that under Texas law, nonsignatories to a contract may still be bound to the contract “under various legal principles.”
(footnote: 17)  Very little Texas case law exists discussing whether a forum selection clause in an agreement can and should be enforced against a nonsignatory.
(footnote: 18)  We agree with the First Court of Appeals that arbitration law on this matter applies by analogy because an arbitration agreement is a type of forum selection clause.
(footnote: 19)  As the Texas Supreme Court has stated, in deciding whether to apply a forum selection clause, an arbitration agreement is “another type of forum-selection clause,” and it “see[s] no meaningful distinction between this type of forum-selection clause and arbitration clauses.”
(footnote: 20)  We therefore can apply arbitration law by analogy to determine whether Tina is bound by the Principal Agreement because she accepted benefits from it.

The Texas Supreme Court has noted six theories recognized by the federal courts in which a nonsignatory may be bound to an arbitration agreement: “(1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel, and (6) third-party beneficiary.”
(footnote: 21)  BFC has raised only equitable estoppel as a basis for enforcing the agreement against Tina as a nonsignatory.
(footnote: 22)  We review for abuse of discretion a trial court’s decision to use the doctrine of equitable estoppel to compel arbitration.
(footnote: 23)
 BFC cites both federal and Texas case law in support of its arguments.  Federal courts “have been hesitant to estop a nonsignatory seeking to avoid arbitration” and have limited estoppel in that context to cases involving nonsignatories who “during the life of the contract, have embraced the contract,” seeking to derive direct benefits from it, but then, “during litigation, attempt to repudiate the arbitration clause in the contract.”
(footnote: 24)  This theory of estoppel is referred to as “direct benefits estoppel.”
(footnote: 25)
 The Texas Supreme Court has stated that direct benefits estoppel applies under Texas law where a nonsignatory seeks or obtains direct benefits from a contract in one of two ways.  First, in 
In re FirstMerit
, 
Bank
, 
the court held that “a litigant who 
sues based on a contract 
subjects him or herself to the contract’s terms.”
(footnote: 26)  The court in
 In re Kellogg Brown & Root, Inc.
, defined what it meant by “to sue ‘based on a contract,’” holding that “a non-signatory should be compelled to arbitrate a claim 
only 
if it seeks, 
through the claim
, to derive a direct benefit from the contract containing the arbitration provisions.”
(footnote: 27)  In resolving whether a claimant by bringing suit seeks to derive a direct benefit from the contract, the determination “turns on the substance of the claim, not artful pleading,”
(footnote: 28) and “[w]hile the boundaries of direct-benefits estoppel are not always clear, nonparties generally must arbitrate claims if liability arises from a contract with an arbitration clause, but not if liability arises from general obligations imposed by law.”
(footnote: 29)
 The Texas Supreme Court subsequently held that direct benefits estoppel can also apply in circumstances other than where benefits from a contract are sought through legal action.
(footnote: 30)  Specifically, the court held that a nonsignatory who deliberately seeks or obtains substantial benefits from the contract itself may be compelled to arbitrate claims against a signatory to the contract.
(footnote: 31)  In determining whether a nonparty deliberately sought or obtained substantial benefits from the contract, our analysis “focuses on the nonparty’s conduct during the performance of the contract.”
(footnote: 32)
 In summary, to be compelled to arbitrate, a nonsignatory must either (1) bring claims in a lawsuit that seek direct benefits from a contract containing an arbitration clause, or (2) deliberately seek and obtain substantial benefits from the contract itself outside of litigation.
(footnote: 33)  Thus in this case, we could only enforce the forum selection clause against Tina if by bringing her claims, she sought direct benefits from the Agreement, determined by deciding whether liability on her claims arises solely from the Agreement between Tim and BFC and must be determined by reference to it,
(footnote: 34) or if by her conduct during the life of the Agreement, she deliberately sought or obtained substantial benefits from the Agreement itself.
(footnote: 35)  BFC argues only the second application of direct benefits estoppel, and we therefore limit our analysis to consider only that issue.
(footnote: 36)
 Applying 
Weekley
, we look to Tina’s conduct during the performance of the contract.  
In 
Weekley
,
 
the nonsignatory not only accepted direct benefits under the contract, she consistently and knowingly insisted that others treat her as a party:
(footnote: 37)  she negotiated directly with Weekley, signed a letter of intent as one of the “purchasers”; directed how Weekley should construct some of the features of the home; “repeatedly demanded extensive repairs of ‘our home’”; “personally requested and received financial reimbursements for expenses ‘I incurred’ while those repairs were made”; and “conducted settlement negotiations with Weekley.”
(footnote: 38) 

Unlike the nonsignatory in 
Weekley
, however, Tina took no part in any negotiations with BFC, never signed a letter of intent or any other document leading up to the sale of the business, never handled any matters in connection with the sale, and never attempted to resolve any problems relating to the Principal Agreement after the sale prior to this litigation.  The record shows that Tina has never insisted, knowingly or otherwise, on being treated as a party to the Principal Agreement.  Accordingly, we hold that Tina did not deliberately seek or obtain benefits from the contract, substantial or otherwise. 

BFC cites two federal cases for its argument that the increase in the community estate causes Tina to be bound by the Principal Agreement:  
In re VMS Limted Partnership Securities Litigation
(footnote: 39) and 
American Bureau of Shipping v. Tencara Shipyard S.P.A.
(footnote: 40)  Neither 
In re VMS 
or 
American Bureau of Shipping
, as federal cases, are determinative of our holding; this court may rely on federal case law as persuasive authority, but we are not bound by it.
(footnote: 41)  Further, neither case cited by BFC applied estoppel on the grounds of an increase in the community estate, and the facts in both cases make them distinguishable.

In 
In re VMS
, a wife was held to be bound to the arbitration provision in an investment services contract signed only by her husband.
(footnote: 42)  The wife in that case had directly accepted the services provided under the contract—and those services affected not only securities owned by both the husband and wife but also securities owned only by the wife.
(footnote: 43)  The contract at issue in this case did not affect any assets owned by Tina in any capacity other than to the extent of her community property interest, and she accepted no services under the contract.  She merely agreed not to argue in the future that the sale was invalid because it included any of her community property interest.

In 
American Bureau of Shipping
, nonsignatory ship owners contracted with a shipbuilder to provide a racing yacht, and the contract specified that the yacht would be “classed according ‘[t]o the quality standards and norms permitting approval of’” a certain ship classification organization.
(footnote: 44)  To obtain such a classification, the shipbuilder then contracted with the classification organization.
(footnote: 45)  The benefits received by the nonsignatories (the owners) because of this contract were direct and substantial:  the owners were able to obtain lower insurance rates and the ability to sail under the French flag, benefits sought by the owners and which they likely could not have obtained without the shipbuilder’s contract with the classification organization.
(footnote: 46)  In the instant case, Tina received no similar direct and substantial benefit.  There was no showing that the contract between Tim and BFC enabled Tina to do anything she otherwise could not have done or that it gave her any benefit that she had sought. 

BFC argues that the facts that the proceeds from the sale were deposited into a bank account on which both Tina and Tim are signatories, and that this account was used by the St. Clairs to pay their mortgage, credit card bills, and car payments, show enough of a benefit to Tina to bind her to the contract.  To apply BFC’s reasoning would mean that any increase in the community estate would always bind a nonsignatory spouse to any contract, including a  noncompete agreement.  We do not believe that the law of equity requires us to stretch the doctrine of estoppel that far.
(footnote: 47)
 We hold that any increase in the community estate of the St. Clairs resulting from the sale of Tim’s business did not provide to Tina a benefit that was so direct and substantial that the doctrine of estoppel applies and binds her to the Principal Agreement.
(footnote: 48)  Consequently, we also hold that Tina is not bound by the forum selection clause.  Accordingly, we further hold that the trial court abused its discretion by granting BFC’s motion to dismiss based on the Principal Agreement’s forum selection clause.  We sustain Tina’s second issue and do not reach her third issue contending that Texas law applies to the determination of the enforceability of the noncompete provisions.
(footnote: 49)
Conclusion

Because we hold that the trial court abused its discretion by granting BFC’s motion to dismiss based on the forum selection clause, we reverse the trial court’s order dismissing the case remand the case for trial.

LEE ANN DAUPHINOT

JUSTICE

PANEL F: DAUPHINOT, GARDNER, and WALKER, JJ.

DELIVERED:  April 12, 2007

FOOTNOTES
1:
See 
Tex. R. App. P.
 47.4.

2:
Phoenix Network Techs. (Europe) Ltd. v. Neon Sys., Inc.
, 177 S.W.3d 605, 610 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

3:
Id.

4:
Mercure Co.
,
 N.V. v. Rowland
, 715 S.W.2d 677, 680-81 (Tex. App.—Houston [1st Dist.] 1986, writ ref’d n.r.e.); 
Huston v. F.D.I.C.
, 663 S.W.2d 126, 129 (Tex. App.—Eastland 1983, writ ref’d n.r.e.); 
Country Cupboard
,
 Inc. v. Texstar Corp.
, 570 S.W.2d 70, 75 (Tex. Civ. App.—Dallas 1978, writ ref’d n.r.e. ).

5:
Downer v. Aquamarine Operators
,
 Inc.
, 701 S.W.2d 238, 241-42 (Tex. 1985), 
cert. denied
, 476 U.S. 1159 (1986).

6:
State v. Sw. Bell Tel. Co.
, 526 S.W.2d 526, 528 (Tex. 1975); 
In re Talco-Bogata Consol. Indep. Sch. Dist. Bond Election
, 994 S.W.2d 343, 347 (Tex. App.—Texarkana 1999, no pet.).

7:
Perry v. Del Rio
, 66 S.W.3d 239, 257 (Tex. 2001); 
Huie v. DeShazo
, 922 S.W.2d 920, 927-28 (Tex. 1996) (orig. proceeding).

8:
Black’s Law Dictionary 
(Bryan A. Garner ed., 8th ed. 2004)
 (defining “signatory” as a “party that 
signs a document
, personally or through an agent, and thereby becomes a party to an agreement”) (emphasis added).

9:
DeSantis v. Wackenhut Corp.
, 793 S.W.2d 670, 677 (Tex. 1990),
 cert. denied
, 498 U.S. 1048 (1991).

10:
Valence Operating Co. v. Dorsett
, 164 S.W.3d 656, 662 (Tex. 2005). 

11:
Reilly v. Rangers Mgmt.
,
 Inc.
, 727 S.W.2d 527, 530 (Tex. 1987).

12:
Valence Operating Co.
,
 
164 S.W.3d at 662
;
 see also Gen. Am. Indem. Co. v. Pepper
, 161 Tex. 263, 339 S.W.2d 660, 661 (1960).

13:
Heritage Res.
,
 Inc. v. NationsBank
, 939 S.W.2d 118, 121 (Tex. 1996).

14:
But see
 
Kirby Highland Lakes Surgery Center
,
 L.L.P. v. Kirby
, 183 S.W.3d 891, 902 (Tex. App.—Austin 2006, no pet.) (noting in factual background that wife signed a document in which she expressly joined in the execution and delivery of the main agreement signed by her husband).

15:
See 
Tex. R. Evid.
 202; 
see also 
Ariz. Rev. Stat. 
§ 25.211 (2000); 
Cal. Fam. Code § 760
 (Deering 2006); 
Idaho Code Ann. § 32-906 
(2006); 
La. Civ. Code Ann.
 art. 2335 (Supp. 2007); 
Nev.  Rev.  Stat.
 § 123.220 (2005); 
N.M. Stat.
 § 40-3-12 (LexisNexis 1999); 
Tex. Fam. Code Ann
. § 3.002 (Vernon 2006); 
Wash. Rev. Code 
§ 26.16.030 (West 2005); 
Wis. Stat. 
§§ 766.001(2), 766.31(1) (2001 & Supp. 2006).

16:
See
 
Reilly
, 727 S.W.2d at 530.

17:
180 S.W.3d 127, 131 (Tex. 2005).

18:
Compare Phoenix Network
, 177 S.W.3d at 605 (applying arbitration law to question of whether to enforce a forum selection clause), 
with Accelerated Christian Educ. Inc. v. Oracle Corp.
, 925 S.W.2d 66, 75 n.12 (Tex. App.—Dallas 1996, no writ) (finding no Texas cases directly addressing the issue of whether a forum selection clause can apply to a nonsignatory and stating that two cases cited by the appellant were not controlling because both addressed the applicability of an arbitration clause).

19:
See Phoenix Network
, 177 S.W.3d at 622-25; 
see also
 
In re AIU Ins. Co.
, 148 S.W.3d 109, 115 (Tex. 2004).

20:
Phoenix Network
, 177 S.W.3d at 623; 
see also
 
In re AIU Ins. Co.
, 148 S.W.3d at 115.

21:
In re Kellogg Brown & Root
,
 Inc.
, 166 S.W.3d 732, 739 (Tex. 2005). 

22:
But see Kirby
, 183 S.W.3d at 902-03 (applying incorporation by reference in a case with similar but distinguishable facts).

23:
Tex. Enters.
,
 Inc. v. Arnold Oil Co.
, 59 S.W.3d 244, 249 (Tex. App.—San Antonio 2001, no pet.);
 Skyleasing
,
 LLC v. Tejas Avco Inc.
, No. 14-05-00212-CV, 2006 WL 2290852, at *3 (Tex. App.—Houston [14th Dist.] Aug, 10, 2006, no pet.).

24:
InterGen N.V. v. Grina
, 344 F.3d 134, 145-46 (1st Cir. 2003).

25:
Kellogg
, 166 S.W.3d at 739.

26:
52 S.W.3d 749, 755 (Tex. 2001) (emphasis added).

27:
Kellogg
, 166 S.W.3d at 741 (emphasis added); 
see also Weekley
, 180 S.W.3d at 132.

28:
Weekley
, 180 S.W.3d at 131-32.

29:
In re Vesta Ins. Group
,
 Inc.
, 192 S.W.3d 759, 761 (Tex. 2006).

30:
Weekley
, 180 S.W.3d at 132-33.

31:
Id.

32:
Id.

33:
Id.

34:
See id
. at 131-32

35:
See 
id.
 at 132-33.

36:
See 
Tex. R. App. P.
 47.1.

37:
Weekley
,
 180 S.W.3d 
at 135.

38:
Id. 
at 133.

39:
26 F.3d 50 (7th Cir. 1994).

40:
170 F.3d 349 (2d Cir. 1999).

41:
Ulico Cas. Co. v. Allied Pilots Ass’n
, 187 S.W.3d 91, 107 (Tex. App.—Fort Worth 2005, pet. granted).

42:
26 F.3d at 52.

43:
Id.

44:
170 F.3d at 351.

45:
Id.

46:
Id.
 at 353.

47:
See Weekley
, 180 S.W.3d at 129, 134-35 (stating that nonparties are bound by an arbitration clause when equity binds them to the contract generally, and whether estoppel applies depends on the facts).

48:
See id.
 at 134 (stating that estoppel does not apply when benefits received are indirect or insubstantial).

49:
See
 
Tex. R. App. P.
 47.1.