**Opinion issued December 14, 2023**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-21-00668-CV

————————————

**BROWN LAB INVESTMENTS, LLC, JOEL KATZ, AND ANDREA KATZ,
Appellants**

**V.**

**LANE MOESSER, Appellee**

---

**On Appeal from the 190th District Court
Harris County, Texas
Trial Court Case No. 2016-35154**

---

### MEMORANDUM OPINION

Appellants Brown Lab Investments, LLC, Joel Katz, and Andrea Katz appeal from the trial court's order denying their motion to vacate, and granting the motion of appellee, Lane Moesser, to confirm an arbitration award. This is the second time that this case comes to our Court.

In the first appeal, we reversed the trial court's confirmation of an arbitration award and remanded for the trial court to conduct an independent review on an issue of substantive arbitrability. Specifically, whether Brown Lab and the Katzes are bound to the arbitration agreement even though they are non-signatories. *Brown Lab Investments, LLC v. Moesser*, No. 01-16-00837-CV, 2018 WL 3733453 (Tex. App.—Houston [1st Dist.] Aug. 7, 2018, no pet.) (mem. op.). The trial court's judgment on remand answered that issue in the affirmative.

In this second appeal, Brown Lab and the Katzes now challenge that judgment and raise four issues. They principally argue that the trial court erred in confirming, and not vacating, the arbitration award against them because they are non-signatories to the arbitration agreement. They also challenge the award of damages against them as being "inconsistent with" the terms of the agreements at issue.

We reverse and render judgment vacating the arbitration award.

## Background[1]

In 2011, Align Strategic Partners, LLC ("Align"),[2] a Delaware limited liability company with its principal place of business in Houston, Texas, was a recruiting

---

[1]    Much of these background facts come from our previous opinion in this case. *See Brown Lab Investments, LLC v. Moesser*, No. 01-16-00837-CV, 2018 WL 3733453 at *1–5(Tex. App.—Houston [1st Dist.] Aug. 7, 2018, no pet.) (mem. op.).

[2]    Align has filed for bankruptcy and is not a party to this appeal. *Infra*. n.8.

firm that specialized in placing finance, accounting, and information-technology professionals in employment positions. The controlling interest in Align was held by Brown Lab, a Delaware limited liability company with its principal place of business in Chicago, Illinois. The controlling interest in Brown Lab was owned by the Katzes, who were residents of the State of Utah.

Moesser, in his Amended and Restated Summary of Dispute and Request for Relief, alleged that, in 2011, when Align was formed, Joel Katz contacted him, along with other prospective owners, and "recruited them away from their positions at reputable employment recruiting companies with a promise of starting a new accountant recruiting business in which they would be part owners." Moesser became an employee and vice president of Align and an owner with a minority interest.

On September 12, 2011,[3] Moesser and Align executed three contracts. First, they executed an Employment Agreement (the "Employment Agreement"). It governed the terms of Moesser's employment and required him to purchase a

---

[3] There is some discrepancy in the record as to the effective date of the Operating Agreement. Brown Lab and the Katzes submitted as a defense exhibit a copy of the Operating Agreement listing the effective date of the agreement as August 17, 2011. Moesser likewise submitted the same version as a plaintiff's exhibit. Attached to his motion to confirm the arbitration award, however, is a copy of the Operating Agreement that lists the effective date as September 12, 2011, the same date as the Employment Agreement and the Purchase Agreement. At the hearing, the parties agreed that the three agreements were entered into at the same time by Moesser. On appeal, the parties do not dispute the effective date of the Operating Agreement.

membership interest in Align. The Employment Agreement contains an arbitration provision that provides:

> Arbitration. Any dispute or claim arising to [sic] or in any way related to this Agreement shall be settled by binding arbitration in Houston, Texas, but any dispute or controversy arising out of or interpreting this Agreement shall be settled in accordance with the laws of the State of Illinois as if this Agreement were executed and all actions were performed hereunder within the State of Illinois. All arbitration shall be conducted in accordance with the rules and regulations of the American Arbitration Association ("AAA"). . . .

Moesser and Align also executed a Membership Interest Purchase Agreement (the "Purchase Agreement") under which Moesser paid $63,333 for a 7.5 percent membership interest in Align. The Purchase Agreement is attached to the Employment Agreement as an exhibit. The Employment Agreement and the Purchase Agreement are both signed by Moesser and by Andrea Katz in her capacity as a representative of Brown Lab, on behalf of Align.

Moesser and Align additionally executed a Limited Liability Company Agreement (the "Operating Agreement"). It governed the operation of Align and its relationship with its members, including Moesser. The Operating Agreement was also signed by the other members of Align, including Brown Lab, which held an 82.5 percent interest.[4] The Operating Agreement does not contain an arbitration

---

[4] At the time of the execution of the Operating Agreement, Align had two other members: Brandy Hanna and La Shunda Ennett, who each owned a 5% interest in Align.

4

provision. It does not reference the Employment Agreement or the Purchase Agreement.

It is undisputed that Brown Lab and the Katzes did not sign any of these agreements in their individual capacities.

Moesser later asserted that the Katzes, through their ownership of Brown Lab, maintained control over the management of Align and the distribution of its profits to the minority shareholders. Moesser claimed that the Katzes, through Brown Lab, "took improper advantage of their majority status and began to siphon money away from the business in contravention of their fiduciary duties to their minority shareholders," including using Align's funds to partially finance their unrelated businesses; to pay individuals who were not providing services to Align; and to pay excessive travel expenses for the Katzes and excessive management fees to Andrea.

Moesser asserted that the Katzes' conduct reduced the distribution of profits to the minority owners to nominal sums. In November 2014, after Moesser voiced objection to the alleged misuse of Align's funds, Joel Katz discharged him from his employment with Align. It is undisputed that Moesser's employment with Align was terminated "without cause."

Align subsequently notified Moesser that it had chosen to exercise its contractual right in the Purchase Agreement to repurchase his membership interest as follows:

5

It is Align's view that an independent appraisal of the Purchased Interests is not worthwhile, as the fair market value of the Purchased Interests is substantially lower than the amount you paid for the Purchased Interests.

By the time you receive this letter, you will have already received a wire transfer in the amount of $63,333.00, the amount you have paid for the Purchased Interests, representing the purchase price for the Purchased Interests in accordance with Section 4(b) of the Purchase Agreement. This amount is given to you in full satisfaction and repurchase of your membership interest in Align, and effective immediately you no longer have any rights with respect to the Purchased Interests.

Moesser rejected Align's repurchase. He believed that the value of his interest was not properly derived in accordance with the terms of the Purchase Agreement. In that regard, section 4(b) of the Purchase Agreement, "Repurchase Rights of the Company," states:

In the event that the Employment Agreement between [Align] and the Subscriber [Moesser] dated September 12, 2011 . . . is terminated, then for a period of sixty days following such termination, [Align] shall have the option to repurchase the Purchased Interests from the Subscriber [Moesser], as follows:

. . . .

(b) If the Employment Agreement is terminated by [Align] without Cause, . . . then the price [Align] must pay upon the exercise of its option shall be the higher of . . . [the] price paid by [Moesser]for the Purchased Units as set forth in this Agreement, or the then current Agreed Value of the Purchased Units (as such term is defined in the [Operating Agreement]).

6

The Operating Agreement defines the term "Agreed Value" as "the fair market value of an asset as of the date of valuation, which shall be determined . . . by an independent appraiser selected by the Board of Managers."

After Moesser disputed Align's valuation of his interest, Align selected an appraiser who prepared a Summary Appraisal Report (the "Report"). The appraiser concluded that "[b]ased on the data, information, and analysis presented in this [Report], it is our opinion that the fair market value of [Moesser's interest in Align] was $42,375 on a minority, non-marketable basis as of December 31, 2014."

Moesser asserted that the Board of Managers, which he noted was controlled by the Katzes, had chosen the appraiser, and that the Report presented a "fundamentally flawed valuation analysis based upon entirely false and misleading data," provided by the Katzes, that "purport[ed] to value the entire enterprise at an amount roughly equal to the liquidation value of two-months-worth of outstanding receivables."

Disputing the independence, validity, and accuracy of the report, Moesser, pursuant to the Operating Agreement and the Delaware Limited Liability Company Act, requested that Align provide him copies of its financial records relevant to evaluating its "true fair market value." Align refused. It asserted that Moesser had already been "fully compensated" for his membership interest and was no longer a member of Align entitled to such information.

7

Align then sued Moesser in a Court of Chancery in Delaware. Align sought a declaration that it validly repurchased Moesser's ownership interest in Align, that Moesser was no longer a member, and that it was not obligated to respond to Moesser's business records demands because Moesser was divested of any interest in Align. *See Align Strategic Partners LLC v. Moesser*, C.A. No. 11240-VCN, 2016 WL 791261, at *1 (Del. Ch. Feb. 26, 2016).[5] Align also claimed that Moesser breached the Operating Agreement by disputing the repurchase of his interest.

Moesser filed a motion to dismiss the Delaware action on the basis that the dispute was subject to the arbitration provision in the Employment Agreement.

The Delaware court concluded that the gravamen of Align's suit was that it had "extinguished Moesser's ownership rights when it sent him the Repurchase Notice and wired $63,333 to his bank account"—a claim that "indisputably implicates the Purchase Agreement . . . [which] does not include an arbitration clause." *Id.* at *4. Thus, the question before the Delaware court was "whether the Employment Agreement and Purchase Agreement have the same subject matter such that the former's arbitration clause justifiably covers this dispute under Illinois law." *Id.* The Delaware court concluded that they do.

It reasoned that although only the Employment Agreement contains an arbitration clause, the Employment Agreement, Purchase Agreement, and Operating

---

[5] Brown and the Katzes were not named parties to the suit in the Delaware court.

8

Agreement each contain provisions that address, in varying degrees, Align's ability to repurchase Moesser's interest when his employment ended. *See id.* at *2. The Employment Agreement provides for both Moesser's initial purchase of "units of membership interest" and Align's option to repurchase those units. *Id.* at *1. The Purchase Agreement, which is attached to the Employment Agreement as an exhibit, provides a framework for Align's repurchase of Moesser's units.

The Delaware court further noted that the Purchase Agreement does not define several terms critical to determining how much Moesser is owed, such as "Cause," "Good Reason," and "Agreed Value." *Id.* at *2. Rather, those terms are defined in the Employment Agreement or, as is the case of the term "Agreed Value," defined in the Operating Agreement. *Id.*

The Delaware Court thus reasoned that "read in concert, the three agreements define a process for determining how much Align 'must pay' Moesser for his Units should it decide to exercise its repurchase option upon termination of Moesser's Employment Agreement." *Id.* It then concluded that the Employment Agreement's broad, generic arbitration clause applied to the dispute between Align and Moesser.

As a result, the Delaware Court dismissed, in favor of arbitration, the portion of the suit before it regarding whether Align had effectively repurchased Moesser's ownership interest. It also stayed, pending the results of the arbitration, the remaining portion of the suit relating to Align's request for a declaration regarding

9

Moesser's business records demand "because that claim does not arise under the Purchase Agreement or the Employment Agreement and requires a determination as to Moesser's membership status." *Id.* at *5.

The dispute then proceeded to arbitration in Houston, Texas. Moesser subsequently added new claims against Brown Lab and the Katzes, in their individual capacities, for breach of contract, breach of fiduciary duty, breach of the duty of good faith and fair dealing, fraud, conversion, and conspiracy. Moesser asserted that Align, Brown Lab, and the Katzes "were, at all material times, the alter egos of one another" and that the alleged acts and omissions of the defendant entities were engaged in by their officers and agents. Moesser sought $1,000,000 in actual damages, $3,000,000 in exemplary damages, attorney's fees, interest, and costs.

Brown Lab and the Katzes objected to being included in the arbitration because they are not parties to the Employment Agreement and did not otherwise agree to arbitrate the claims made against them.

The arbitrator denied their objection and issued a Final Award against them, jointly and severally, for $750,000 in "actual damages for all of the claims and causes of action" that Moesser asserted in the arbitration.[6] The arbitrator also ruled that, following payment of the award, Moesser "shall no longer hold any ownership interest in, and shall no longer be a member of," Align.

---

[6] The arbitrator denied Moesser's request for exemplary damages.

10

Moesser moved to confirm the arbitration award in the trial court below. Align, Brown Lab, and the Katzes moved to vacate the award on the following grounds: (1) they are not parties to any arbitration agreement with Moesser; (2) the issue of whether non-signatories to a contract can be bound by an arbitration clause therein constitutes a threshold matter of arbitrability for the courts, not arbitrators, to decide; and, (3) the arbitrator "exceeded his powers" by determining the issue of arbitrability.

The trial court granted Moesser's motion to confirm the arbitration award and denied the motion to vacate by Align, Brown Lab, and the Katzes. After a hearing, the trial court signed a final judgment in accordance with its order confirming the arbitration award. Align, Brown Lab, and the Katzes appealed that final judgment.

Shortly after the trial court signed its final judgment, Align filed a voluntary petition for bankruptcy in the United States Bankruptcy Court for the Southern District of Texas.[7] The bankruptcy filing suspended the first appeal in this Court.

---

[7] During the course of Align's bankruptcy proceedings, a trustee was appointed by the bankruptcy court to manage Align's estate. The trustee filed an adversary proceeding against Brown Lab and the Katzes asserting various claims, including claims for alleged fraudulent transfers from Align to Brown Lab and the Katzes. The trustee, Brown Lab, and the Katzes ultimately reached a settlement of the adversary complaint.

11

*See* TEX. R. APP. P. 8.2.  Moesser, Brown Lab, and the Katzes filed a joint motion to sever Align's appeal so the appeal between them could proceed—which we granted.[8]

In our first opinion, we reversed the trial court's judgment confirming the arbitration award and remanded for that court to conduct an independent review of the issue of arbitrability. *Brown Lab Investments*, 2018 WL 3733453, at *11.  We concluded that Brown Lab and the Katzes, in their individual capacities, are non-signatories to the arbitration agreement.  And that the question of whether Brown Lab and the Katzes can be bound by the arbitration agreement is a matter for the trial court to decide, thus the arbitrator exceeded his authority by deciding that "gateway issue."[9] *Id.* at *11.

On remand, Moesser filed a second motion to confirm the arbitration award. Moesser argued that Brown Lab should be deemed a signatory of the Employment Agreement (which contains the arbitration provision), because the Employment Agreement, Purchase Agreement, and Operating Agreement should be construed together as a single contract.

---

[8] We severed Align's appeal into separate cause number 01-16-01019-CV, styled *Align Strategic Partners, LLC v. Lane Moesser*, where it remains suspended.  We also ordered that the instant appeal be restyled as *Brown Lab Investments, LLC, Joel Katz and Andrea Katz v. Lane Moesser*. *See* TEX. R. APP. P. 8.3(b).

[9] We expressly did not reach the question of whether Brown Lab and the Katzes, in their individual capacities, might nevertheless be bound to arbitrate under principles of contract and agency law. *Brown Lab Investments*, 2018 WL 3733453, at *9 n.7.

Moesser also argued that, even if Brown Lab is deemed not to be a signatory to the arbitration agreement, Brown Lab and the Katzes should nevertheless be bound as non-signatories under a veil-piercing/alter ego theory. Brown Lab and the Katzes responded and again moved to vacate the award.

In March 2021, the trial court conducted a multi-day evidentiary hearing on the issue of arbitrability. Much of the evidence and testimony focused on the theory that Brown Lab and the Katzes were the alter egos of Align. The trial court then made the following rulings on the arbitrability of Moesser's claims against Brown Lab and the Katzes:

> 1. Moesser's claims against Brown Lab and the Katzes are arbitrable;

> 2. Based on the totality of the circumstances and an evaluation of the evidence and testimony presented and the credibility of the witnesses, Moesser's Employment Agreement, the Membership Interest Purchase Agreement, and the Align Strategic Partners LLC Operating Agreement were contemporaneously executed as part of a single transaction and should be construed together as one agreement;

> 3. Based on the totality of the circumstances and an evaluation of the evidence and testimony presented and the credibility of the witnesses, Brown Lab and the Katzes acted as alter egos of Align Strategic Partners, LLC ("Align"), and

> 4. Based on the totality of the circumstances and an evaluation of the evidence and testimony presented and the credibility of the witnesses, the Katzes acted as alter egos of Brown Lab in Brown Lab's dealings with Align.

> . . . .

5. Brown Lab and the Katzes are subject to arbitration under Moesser's Employment Agreement with Align under the alter ego doctrine; and

6. Separately, and in the alternative, Brown Lab is subject to arbitration under Moesser's Employment Agreement with Align because the Employment Agreement, the Membership Interest Purchase Agreement, and the Align Operating Agreement were all executed as part of a single, contemporaneous transaction and thus must be construed together.[10]

Thereafter, the trial court confirmed the arbitration award in its entirety and signed a new final judgment to that effect. Brown Lab and the Katzes now appeal that final judgment.

## Arbitrability

Brown Lab and the Katzes argue that the trial court erred in confirming, and not vacating, the arbitration award for four reasons.

*First*, that the trial court erred in determining that Brown Lab and the Katzes acted as alter egos of Align, and that the Katzes acted as alter egos of Brown Lab in their dealings with Align, such that they could be bound to Align's arbitration agreement with Moesser.

*Second*, that the trial court erred in finding that the Employment Agreement, Purchase Agreement, and Operating Agreement were part of a single transaction,

---

[10] Moesser also argued that Brown Lab and the Katzes were subject to the arbitration provision because each were intended third-party beneficiaries to the Employment Agreement. The trial court did not conclude that the Katzes or Brown Lab was bound by the arbitration provision under this theory and Moesser does not argue on appeal that this theory applies. So, it is not before us.

such that they can be construed together to bind Brown Lab to the arbitration agreement in the Employment Agreement.

*Third*, that the arbitrator exceeded his powers by disregarding the independent appraisal, requiring Align to exercise its option to repurchase Moesser's interest, and forcing Brown Lab and the Katzes to repurchase Moesser's interest in Align.

And *fourth*, that the trial court's determination that the claims against Brown Lab and the Katzes were arbitrable was erroneous.

The first two issues are dispositive of this appeal. *See* TEX R. APP. P. 47.1.

**Standard of Review and Applicable Law**

We review a trial court's decision to vacate or confirm an arbitration award de novo based on a review of the entire record. *Port Arthur Steam Energy LP v. Oxbow Calcining LLC*, 416 S.W.3d 708, 713 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). When a trial court renders a final judgment confirming an arbitration award, the court's interlocutory orders merge into the judgment and can be challenged on appeal of that judgment. *Bonsmara Natural Beef Co., LLC v. Hart of Texas Cattle Feeders, LLC*, 603 S.W.3d 385, 390 (Tex. 2020).

Because judicial review "adds expense and delay, thereby diminishing the benefits of arbitration as an efficient, economical system for resolving disputes," review of an arbitration award is "extraordinarily narrow." *CVN Group, Inc. v. Delgado*, 95 S.W.3d 234, 238 (Tex. 2002); *E. Tex. Salt Water Disposal Co. v.*

15

*Werline*, 307 S.W.3d 267, 271 (Tex. 2010). An arbitration award is presumed valid and is entitled to great deference. *Royce Homes, L.P. v. Bates*, 315 S.W.3d 77, 85 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

Under this standard of review, every reasonable presumption must be indulged to uphold an arbitrator's decision, and none is indulged against it. *City of Baytown v. C.L. Winter, Inc.*, 886 S.W.2d 515, 518 (Tex. App.—Houston [1st Dist.] 1994, writ denied). Judicial scrutiny of these awards focuses on the integrity of the arbitration process, not on the propriety of the result. *Women's Reg'l Healthcare, P.A. v. FemPartners of N. Tex., Inc.*, 175 S.W.3d 365, 367–68 (Tex. App.—Houston [1st Dist.] 2005, no pet.). Accordingly, a trial court may not vacate an arbitration award even if it is based upon a mistake of fact or law. *Universal Comput. Sys., Inc. v. Dealer Sols., L.L.C.*, 183 S.W.3d 741, 752 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

An arbitration award has the same effect as a judgment of a court of last resort, and a reviewing court may not substitute its judgment for that of the arbitrator merely because it would have reached a different result. *See CVN Grp.*, 95 S.W.3d at 238; *J.J. Gregory Gourmet Servs., Inc. v. Antone's Imp. Co.*, 927 S.W.2d 31, 33 (Tex. App.—Houston [1st Dist.] 1995, no writ). A party seeking to vacate an arbitration award bears the burden of presenting a complete record that establishes grounds for

vacating the award. *Statewide Remodeling, Inc. v. Williams*, 244 S.W.3d 564, 568 (Tex. App.—Dallas 2008, no pet.).

An arbitration award governed by the Federal Arbitration Act ("FAA") must be confirmed, unless it is vacated, modified, or corrected on certain limited grounds. *See* 9 U.S.C. § 9; *Thomas James Assocs., Inc. v. Owens*, 1 S.W.3d 315, 319–20 (Tex. App.—Dallas 1999, no pet.). One such ground is "where the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4); *Citigroup Global Mkts., Inc. v. Bacon*, 562 F.3d 349, 352 (5th Cir. 2009). Arbitrators exceed their powers if they decide matters not properly before them. *Ancor Holdings, LLC v. Peterson, Goldman & Villani, Inc.*, 294 S.W.3d 818, 829 (Tex. App.—Dallas 2009, no pet.); *Barsness v. Scott*, 126 S.W.3d 232, 241 (Tex. App.—San Antonio 2003, pet. denied). For instance, an arbitrator exceeds his or her powers by issuing an arbitration award against a party who is not subject to arbitration. *Rapid Settlements, Ltd. v. Green*, 294 S.W.3d 701, 707 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (internal quotations omitted). Whether a person or entity is a party to an arbitration agreement, and therefore bound by any award issued, presents a question of "arbitrability." *Id.*; *see also Leshin v. Oliva*, No. 04-14-00657-CV, 2015 WL 4554333, at *5 (Tex. App.—San Antonio July 29, 2015,

17

no pet.) ("The question of arbitrability encompasses what claims may be submitted to arbitration and who can be bound to an arbitration agreement.").

Determining whether a non-signatory is bound to an arbitration agreement is a gateway matter of substantive arbitrability for a trial court to decide, not an arbitrator. *See G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 524 (Tex. 2015). This determination is reviewed under a de novo standard. *Jody James Farms, JV v. Altman Group, Inc.*, 547 S.W.3d 624, 629 (Tex. 2018); *see also In re Weekley Homes, L.P.*, 180 S.W.3d 127, 130 (Tex. 2005) (whether arbitration agreement is binding on nonparty is "gateway matter[]" to be decided by trial court). When the FAA[11] governs an arbitration clause, Texas courts apply Texas procedural rules and Texas substantive law on arbitration, "while endeavoring to keep it as consistent as possible with federal law." *In re Weekley Homes*, 180 S.W.3d at 131.[12]

---

[11]  The parties do not dispute that the FAA applies here. Although Brown Lab and the Katzes reference the Texas Arbitration Act ("TAA") in passing in their brief, it is only to note that in Moesser's first motion to confirm the arbitration award, he sought confirmation under both the TAA and the FAA. However, they also point out in Moesser's second motion to confirm, he argued that the FAA should apply. In our previous opinion, we applied the FAA. *See Brown Lab Investments*, 2018 WL 3733453, at *6 n.6. Having been presented with no argument that the TAA is applicable here, we again look to the FAA.

[12]  We note that the Employment Agreement, which contains the arbitration clause, states that it is governed by Illinois law. The parties do not argue that Illinois law should apply to the issue of whether a non-signatory can be bound by an arbitration agreement. Rather, in a passing footnote, Brown Lab and the Katzes simply note that Illinois law governs the Employment Agreement and that the same six theories that bind a non-signatory under Texas law apply in Illinois as well. Moesser, for his part, makes no reference to Illinois law in his alter-ego analysis.

18

In that regard, "[g]enerally, only signatories to an arbitration agreement are bound by the agreement." *Elgohary v. Herrera*, 405 S.W.3d 785, 789–90 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (internal quotations omitted).[13] However, Texas and federal law both recognize six theories under which a trial court may compel a non-signatory to arbitrate. *Id.* at 793 (citing *In re Merrill Lynch Trust Co.*, 235 S.W.3d 185, 191 (Tex. 2007), and *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003)). They are: (1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing/alter ego, (5) estoppel, and (6) third-party beneficiary. *Bridas*, 345 F.3d at 356. Here, the trial court relied on the fourth theory—veil-piercing/alter ego.

---

Texas courts may presume that another state's law is the same as Texas law absent proof or argument to the contrary. *Coca–Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 685 (Tex. 2006); *Cooper Indus., LLC v. Pepsi-Cola Metro. Bottling Co., Inc.*, 475 S.W.3d 436, 442 n.5 (Tex. App.—Houston [14th Dist.] 2015, no pet.). The party requesting application of a foreign law has the initial burden of showing that the foreign law conflicts with Texas law. *Cooper Indus.*, 475 S.W.3d at 442 n.5; *see Greenberg Traurig of New York, P.C. v. Moody*, 161 S.W.3d 56, 70 (Tex. App.—Houston [14th Dist.] 2004, no pet.). Because all parties in this case apply Texas law and do not apply Illinois law or otherwise assert the outcome would be different under Illinois law, we also apply Texas law to the issue of substantive arbitrability here involving the non-signatories. *Cf. Cooper Indus., LLC*, 475 S.W.3d at 442 n.5.

[13]   *See Roe v. Ladymon*, 318 S.W.3d 502, 510 (Tex. App.—Dallas 2010, no pet.) (noting "foundational principle" that arbitration is matter of contract).

19

## 1.     Piercing the Veil

In their first issue, Brown Lab and the Katzes argue that the trial court's decision to pierce the corporate veils of Align and Brown Lab was erroneous because Moesser, who was a member of Align, cannot pierce the corporate veil of his own company.[14]  Specifically, Brown Lab and the Katzes argue that Moesser's attempt to pierce the corporate veil of Align fails because Delaware law does not allow a member of a limited liability company to pierce the veil of his own company.[15] They contend that as a member of Align, Moesser obtained the benefits of Align's corporate veil and, under Delaware law, he cannot now assert that Align, the

---

[14]     Because this issue is dispositive, we do not reach their other arguments regarding piercing of the corporate veil because they are not necessary to the final disposition of this appeal. *See* TEX. R. APP. P. 47.1.  In that regard, Brown Lab and the Katzes also argued that even if Moesser could pierce the corporate veil of his own company, any effort to do so with respect to a company in bankruptcy (Align) belongs solely to the bankruptcy trustee—not Moesser.  Additionally, they argued that even if Moesser could overcome these substantive hurdles—the evidence does not support the trial court's ruling piercing *both* Align's and Brown Lab's corporate veils.

[15]     Because Align is a Delaware LLC, Delaware law governs the alter ego determination. *See* TEX. BUS. ORGS. CODE § 1.104 ("The law of the jurisdiction that governs an entity as determined under Sections 1.101-1.103 applies to the liability of an owner, a member, or a managerial official of the entity in the capacity as an owner, a member, or a managerial official for an obligation, including a debt or other liability, of the entity for which the owner, member, or managerial official is not otherwise liable by contract or under provisions of law other than this code."); *Ace Am. Ins. Co. v. Huntsman Corp.*, 255 F.R.D. 179, 195 (S.D. Tex. 2008) ("To the extent that state law applies to determine whether to bind a non-signatory, courts have held that the law of the state of incorporation for the entity whose corporate form is at issue applies to determine whether to pierce the corporate veil.").

company of which he was a member, was a sham and pierce the company's veil for his own benefit.

"Delaware public policy disfavors disregarding the separate legal existence of business entities." *Manichaean Capital, LLC v. Exela Techs., Inc.*, 251 A.3d 694, 706 (Del. Ch. 2021) (internal quotations omitted).  With that said, in "exceptional case[s]," corporate veil-piercing is necessary and appropriate. *Id.*  Delaware courts consider a number of factors in determining whether to disregard the corporate form and pierce the corporate veil, including: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder." *Id.*; *see also Doberstein v. G-P Indus., Inc.*, C.A. No. 9995-VCP, 2015 WL 6606484, at *4 (Del. Ch. Oct. 30, 2015).  While these factors are useful, any single one of them is not determinative. *Manichaean Capital, LLC*, 251 A.3d at 706–07.  An ultimate decision regarding veil-piercing is largely based on some combination of these factors, in addition to "an overall element of injustice or unfairness." *Id.* (internal quotations omitted).

The doctrine of piercing the corporate veil under Delaware law thus enables contract creditors to reach the assets of the owners of an entity if they can meet the multi-factor test discussed above. *Virtus Capital L.P. v. Eastman Chem. Co.*, No.

21

CV 9808-VCL, 2015 WL 580553, at *16 (Del. Ch. Feb. 11, 2015). The doctrine is also available to tort claimants. *Id.* Delaware courts, however, traditionally have not applied the doctrine of piercing the corporate veil "to address internal claims of mismanagement or self-dealing brought by investors against the entity's decision-makers." *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 667 (Del. Ch. 2012); *Virtus Capital L.P.*, 2015 WL 580553, at *16. The doctrine historically has not been applied in this context because it has been unnecessary—Delaware courts recognize a direct cause of action for breach of fiduciary duty.

As the *Feeley* court explained, in the corporate context, Delaware law provides stockholders with a right of action (either directly or derivatively) against board members who breach their fiduciary duties of loyalty and care. *Feeley*, 62 A.3d at 668. Recognizing that breach of fiduciary duty is an equitable claim, courts applying equitable principles therefore had little trouble extending liability for breach of fiduciary duty beyond the natural persons who served as directors to outsiders like majority stockholders who effectively controlled the corporation. *Id.* Delaware corporate decisions "consistently have looked to who wields control in substance and have imposed the risk of fiduciary liability on the actual controllers." *Id.* Delaware courts therefore recognize that those actually in control of various types of limited liability entities, including corporations, limited partnerships, and

22

LLCs, including the human controllers of the entity fiduciary, may be held liable for breach of fiduciary duty.[16]

Moesser contends that this general principal does not apply here because the question before this Court is not whether Moesser can establish liability against Brown Lab and the Katzes for mismanaging Align based on an alter ego theory; but, rather, whether Moesser's claims, irrespective of their merits, are subject to arbitration. While it is true that the *Feeley* court was not considering the threshold issue in this case, i.e., whether a non-signatory can be bound to an arbitration agreement based on an alter ego theory—Moesser has not pointed us to any case law demonstrating that different rules for determining whether to pierce the corporate veil should apply in the context of binding a non-signatory to an arbitration agreement than they do for determining ultimate liability based on an alter-ego theory. Nor are we aware of any.

The single case that Moesser cites for his position that the alter ego theory can be used by a member or investor in an LLC to compel a non-signatory managing

---

[16]     *See, e.g.*, *Paige Capital Mgmt. LLC v. Lerner Master Fund, LLC*, C.A. No. 5502-CS, 2011 WL 3505355, at *30 (Del. Ch. Aug. 8, 2011) (imposing fiduciary liability on individual who was managing member of LLC that acted as general partner for limited partnership); *Kahn v. Lynch Commc'n Sys. Inc.*, 638 A.2d 1110, 1114–15 (Del. 1994) (holding that 43% stockholder that exercised actual control over subsidiary could be liable for breach of fiduciary duty); *see also In re USACafes, L.P. Litigation*, 600 A.2d 43 (Del. Ch. 1991) (holding individual members of corporate general partner, who controlled general partner, owed fiduciary duties to limited partners).

23

member of the LLC to arbitration, *Legend Nat'l Gas II Hldgs., LP v. Hargis*, No. C.A. No. 7213-VCP, 2012 WL 4481303, at \*6 (Del. Ch. Sept. 28, 2012), is inapposite.

In that case, Hargis was an investor in, co-founder and Vice President of, Legend Natural Gas, LLC, a Delaware LLC. *Legend Nat'l Gas*, 2012 WL 4481303, at \*1. Legend was owned by three limited partnerships, and these three limited partnerships resulted from a 2011 restructuring of three predecessor partnerships. *Id.* Hargis's employment agreement contained an arbitration provision and was signed by Hargis and Legend, as well as by the three predecessor partnerships as guarantees. *Id.* Hargis was ultimately terminated, and the three limited partnership members of Legend sued Hargis, seeking a declaratory judgment regarding amounts he was owed as a result of his termination. *Id.* at \*3. Hargis sought to compel arbitration based on the arbitration provision contained in his employment agreement. *Id.* The limited partnership members responded that they never agreed to arbitrate, because it was the predecessor partnerships that signed the employment agreement. *Id.*

The Delaware court in *Legend Natural Gas* rejected the limited partnership members' argument that they were not bound by the arbitration clause in the employment agreement, holding that they were "successors-in-interest of the Predecessor Partnerships by virtue of the 2011 restructuring." *Id.* at \*6. And as a general rule, "a successor corporation which is merely the 'alter ego' of the

24

predecessor is bound by the arbitration clause of an agreement made by the predecessor." *Id.* The court engaged in no further analysis of alter ego principles or the doctrine of piercing the corporate veil.

*Legend Natural Gas* is inapplicable here because the Delaware court was not presented with, and thus did not address, the question before us today, i.e., whether a minority member can pierce the corporate veil of its own LLC to bind a non-signatory, managing member to an arbitration agreement. Further, it is undisputed that Align is not the predecessor-in-interest of Brown Lab or the Katzes. Finally, Hargis was attempting to bind the limited partnership members to the arbitration provision on the basis that they were the alter ego of the predecessor partnerships, not Legend, the LLC of which Hargis was a member. Thus, the factual basis and the legal basis for the Delaware court's decision in *Legend Natural Gas* is different than here.

We see no reason, and are aware of no reason under Delaware law (or Texas law for that matter), for applying a different alter ego test in determining whether to bind a non-signatory to an arbitration agreement than in determining liability. We therefore conclude that the general rule under Delaware law that the doctrine of piercing the corporate veil does not apply to internal claims brought by shareholders or members against controlling persons or entities applies in the arbitration context.

Accordingly, we hold that Moesser, as a member of Align, cannot use the alter ego theory to bind Brown Lab and the Katzes to the arbitration provision in the Employment Agreement. Because this is the only non-signatory theory relied upon by the trial court to bind both Brown Lab and the Katzes to arbitration, we hold that the trial court erred in ruling that Moesser's claims against Brown Lab and the Katzes are arbitrable. We therefore further hold that the arbitrator exceeded his powers and the trial court reversibly erred in confirming, and not vacating, the arbitration award as to Brown Lab and the Katzes. *See Elgohary*, 405 S.W.3d at 789 (citing *Rapid Settlements*, 294 S.W.3d at 707).

We sustain the first issue.

## 2. Single Transaction

We next consider whether Brown Lab alone was bound to arbitrate by construing the Operating Agreement together with the Employment Agreement and the Purchase Agreement as a single contract. The trial court ruled in its July 9, 2021 order as follows:

> Separately, and in the alternative, Brown Lab is subject to arbitration under Moesser's Employment Agreement with Align because the Employment Agreement, the Membership Interest Purchase Agreement, and the Align Operating Agreement were all executed as part of a single, contemporaneous transaction and thus must be construed together.

Brown Lab argues that this ruling exceeds the scope of our prior remand and therefore is not properly before us. We disagree. The parties did not argue in the

26

prior appeal about whether the Operating Agreement should be construed together with the Employment Agreement and the Purchase Agreement in considering arbitrability. As a result, we did not address it in our earlier opinion.[17] *Brown Lab Investments*, 2018 WL 3733453, at \*8–9.

Consequently, in remanding for further proceedings "so that the trial court may conduct an independent review on the issue of arbitrability," we did not limit the trial court's analysis to just the six non-signatory theories above. *Id.* at \*11; *see also In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 644 (Tex. 2009) ("[N]onsignatories to an agreement subject to the FAA may be bound to an arbitration clause when rules of law or equity would bind them to the contract generally."). As a result, this issue is indeed properly before us in this second appeal.

In that regard, Moesser argues that Texas courts, including this Court, have recognized this theory as a basis for compelling non-signatories to arbitration and concluding that "agreements executed at the same time as part of the same transaction, even if by different parties, which refer to and incorporate terms from each other, should be read together and can be the basis for compelling non-signatories to arbitration."

---

[17] We also did not "reach whether Brown, Andrea, and Joel, as non-signatories to the arbitration agreement, might nevertheless be bound to arbitrate under principles of contract and agency law." *Id.* at \*9 n.7.

27

In support of this argument, Moesser cites to our opinion in *Houston Progressive Radiology Associates, PLLC v. Lee*, 474 S.W.3d 435 (Tex. App.—Houston [1st Dist.] 2015, no pet.), where we held that non-signatories could be required to arbitrate claims based on an arbitration agreement executed as part of a single transaction.[18]  In that case, two professional associations, Dr. Stephen Lee, P.A. and Dr. Dean Paul Chauvin, P.A. joined Houston Progressive Radiology Associates (HPRA). *Id.* at 439.  These professional associations were owned and controlled by Drs. Lee and Chauvin, respectively, who each participated in HPRA but were employees of their respective professional associations. *Id.*  Eventually, Drs. Lee and Chauvin withdrew their respective professional associations from HPRA and became employees of HPRA. *Id.* at 440.

---

[18]   Brown Lab contends that Texas law should not apply to determine whether these contracts can be construed together as a single transaction because the Employment Agreement is governed by Illinois law and the Operating Agreement is governed by Delaware law.  It argues that under Delaware and Illinois law, contracts can only be construed together when they are executed at the same time, as part of the same transaction, and by the same parties. *See, e.g.*, *Fiat N. Am. LLC v. UAW Retiree Med. Benefits Tr.*, No. CV 7903VCP, 2013 WL 3963684, at *8 (Del. Ch. July 30, 2013); *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007).  Thus, under Delaware and Illinois law, the Operating, Employment, and Purchase Agreements cannot be construed together as one agreement because they are signed by different parties. Because this argument was not raised in the trial court, we do not address it. *See* TEX. R.. APP. P. 33.1; *see also Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 473 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) ("Choice of law issues can be waived if not properly invoked.").  But in applying Texas law to this issue, as we must, *supra* n.12, we end up in the same place—holding that these agreements cannot be construed together for the purpose of determining whether Brown Lab is bound by the arbitration provision in the Employment Agreement that it did not sign.

To effectuate this change, Drs. Lee and Chauvin each executed two documents: (1) a membership interest transfer and general release agreement, which set forth the terms of Lee P.A.'s and Chauvin P.A.'s respective sales of their ownership interests in HPRA and were signed by the professional associations and HPRA, and (2) the physician employment agreements, which set forth the terms of Dr. Lee's and Dr. Chauvin's employment with HPRA and were signed by Drs. Lee and Chauvin and HPRA. *Id.* All of the documents bore the same effective date and were drafted by counsel for HPRA. *Id.* Each transfer agreement required the signatory doctor to execute an employment agreement, described the transaction as a "transition from being a Member . . . to an employee," and contained other provisions explicitly referring to the respective doctor's employment agreement. *Id.*

In turn, the employment agreements in *Houston Progressive* referred to the respective doctor's transfer agreement and the sales effected by those transfer agreements, including providing that HPRA would pay the doctors bonuses "as consideration for Employee agreeing to transition from being a Member of [HPRA] to an Employee." *Id.* at 441. Significantly, the employment agreements, signed by Drs. Lee and Chauvin individually, contained an arbitration provision. *Id.* The transfer agreements, signed by the doctors' respective professional associations, did not. *Id.*

The doctors' professional associations sued HPRA, arguing that it had breached its fiduciary duties and that it had violated provisions of the company agreement. *Id.* HPRA moved to compel arbitration against the doctors' professional associations, based on arbitration provision in the doctors' employment agreements, which the trial court denied. *Id.* On appeal, this Court agreed with HPRA and held that the transfer and employment agreements must be construed together. *Id.* at 444.

We explained in *Houston Progressive* that "[w]here the parties include a broad arbitration provision in an agreement that is 'essential' to the overall transaction, [courts] presume that they intended the [arbitration] clause to reach all aspects of the transaction—including those aspects governed by other contemporaneously executed agreements that are part of the same transaction." *Id.* at 443 (internal quotations omitted) (citing *Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.*, 297 F.3d 388, 394–95 (5th Cir. 2002); *Kirby Highland Lakes Surgery Ctr. v. Kirby*, 183 S.W.3d 891, 900–01 (Tex. App.—Austin 2006, orig. proceeding)). We then followed "[t]he general rule . . . that separate instruments or contracts executed at the same time, *for the same purpose*, and in the course of the same transaction are to be considered as one instrument, and are to be read and construed together." *Id.* at 443–44 (emphasis added) (internal quotations omitted).[19]

---

[19] *See Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex. 1981); *see also Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1979) ("Separate instruments contemporaneously executed

30

We rejected the professional associations' argument that they should not be bound by the arbitration provisions in the employment agreement because they were not parties to those agreements, explaining that the overall transactions were described in each document, including the transfer documents, as an "Employee agreeing to transition from being a Member of [HPRA] to an Employee." *Id.* at 444.

We thus held in *Houston Progressive* that the agreements were contemporaneously executed as part of the same transaction, related to the same subject matter, and thus, necessarily had to be construed together because:

- They were executed on the same day,

- They each expressly referred to the other,

- They were each an "essential" part of the overall transaction, i.e., the doctors' transition from being members of HPRA to employees,

- The transfer agreements—the documents that did not contain the arbitration clause—expressly required the execution of the employment agreements—the documents containing the arbitration clause, and

- The transfer agreements specified that they were to be construed together with the employment agreement to determine the parties' rights and obligations.

*Id.* at 444–46.

This case is different. It is true that the Employment Agreement, Purchase Agreement, and Operating Agreement were all executed on the same day, that the

---

as a part of the same transaction and *relating to the same subject matter* may be construed together as a single instrument." (emphasis added)).

31

Employment Agreement expressly refers to the Purchase Agreement, and that the Purchase Agreement expressly refers to the Operating Agreement to supply the definition of "Agreed Value." But that is where the connections end.

Unlike the transfer agreements in *Houston Progressive*, a careful review of the terms of these agreements demonstrates that they are not components of a single, unified instrument.

For example, the parties to the Operating Agreement are identified as Align and its members: Brown Lab (signed by Andrea Katz), Brandy Hanna, La Shunda Ennett, and Moesser. Align is identified in the Operating Agreement as "a limited liability company [organized] on May 24, 2011 under the laws of the State of Delaware," and whose purpose "is to provide professional staffing services to the extent that such business conduct is lawful under the [Delaware Limited Liability Company] Act."

The Operating Agreement further describes its purpose as follows: "The Members desire to enter into this Operating Agreement which sets forth, among other things, the governance of the Company, the respective ownership interests of the Members, and the relationships of the parties."

Noticeably absent from the Operating Agreement is any mention of the Employment Agreement or the Purchase Agreement, let alone any requirement of execution of either agreement. And unlike the transfer agreements in *Houston*

32

*Progressive*, the Operating Agreement does not state that it is to be construed together with the Employment Agreement or the Purchase Agreement to determine the parties' rights and obligations.

Our conclusion is also supported by the Delaware Court of Chancery's opinion in *Align Strategic Partners*, 2016 WL 791261, at * 4, that construes these same agreements. The Delaware court held that the Employment Agreement and Purchase Agreement share the same subject matter because together they establish Moesser's rights and obligations as an Align employee and are structurally interconnected. *Id.* But, unlike those two agreements, the Operating Agreement does not contain any language stating or implying that it was executed for the sole purpose of establishing Moesser's rights as an employee of Align.

Instead, as the Delaware Court of Chancery recognized, the Operating Agreement defines Moesser's (and other members) entitlements and duties as an Align member. *See id.* Thus, while the Employment Agreement and Purchase Agreement share the same aim—"defining Moesser's rights and obligations as an Align employee"—the Operating Agreement is much broader and governs the operation of Align and its relationship with its members, including Moesser. *See id.*

Further supporting the conclusion that the Operating Agreement is distinct from the Employment Agreement is the inclusion of merger clauses[20] in both agreements and different governing law provisions. The Operating Agreement is governed by Delaware law and states: "This Agreement constitutes the entire agreement among the parties hereto and contains all the agreements among such parties with respect to the subject matter hereof and supersedes any and all other agreements, either oral or written, between such parties with respect to the subject matter hereof." The Employment Agreement, which is governed by Illinois law, similarly states "[t]his Agreement contains the entire agreement of the parties with respect to its subject matter. This Agreement may not be altered, amended or modified except in writing duly executed by both of the parties."

The existence of a merger clause in both agreements thus confirms that they are separate and distinct from one another, and that the parties did not intend otherwise. Because the two agreements impose distinct obligations with respect to separate subject matters and are subject to different governing laws, we conclude

---

[20] "A merger clause is a 'contractual provision stating that the contract represents the parties' complete and final agreement and supersedes all informal understandings and oral agreements relating to the subject matter of the contract.'" *Rieder v. Woods*, 603 S.W.3d 86, 96 (Tex. 2020) (quoting *Integration (Merger) Clause*, BLACK'S LAW DICTIONARY (11th ed. 2019)).

that the entire agreement clauses in both agreements reaffirms the separateness of the two instruments.[21]

Accordingly, for all of these reasons, we hold that the trial court erred in ruling that Brown Lab was subject to arbitration under Moesser's Employment Agreement with Align on the basis that the Employment Agreement, Purchase Agreement, and Operating Agreement were all executed as part of a single, contemporaneous transaction and had to be construed together. We further hold that the trial court erred in ruling that Moesser's claims against Brown Lab are arbitrable.

By issuing an arbitration award against Brown Lab, a party not subject to arbitration, the arbitrator therefore exceeded his powers and the trial court reversibly erred in confirming, and not vacating, the arbitration award as to Brown Lab. *See Elgohary*, 405 S.W.3d at 789 (citing *Rapid Settlements*, 294 S.W.3d at 707).

We sustain the second issue.

## Conclusion

Because we hold that Moesser's claims against Brown Lab and the Katzes are not arbitrable, and that the trial court below reversibly erred in ruling otherwise, we

---

[21]    *Cf. Rieder*, 603 S.W.3d at 95–98 (holding two agreements executed by different parties, dealing with different subject matters, governed by different law, and containing separate merger clauses were not components of single, unified instrument and would not be construed together to apply forum-selection clause to non-signatories).

35

reverse the trial court's final judgment confirming the arbitration award in this case and render judgment vacating the arbitration award in its entirety.


Terry Adams
Chief Justice


Panel consists of Chief Justice Adams and Justices Hightower and Countiss.